**MICHIGAN PROTECTION AND ADVOCACY SERVICE, INC., et al., Plaintiffs,**

**v.**

**Peggy BABIN, et al., Defendants.**

**No. 90–70181.**

United States District Court, E.D. Michigan, S.D.

July 22, 1992.

Dorothy M. Smith, Livonia, Mich., Stewart Hakola, Marquette, Mich., Jay D. Kaplan, Northville, Mich., for Michigan Protection.

Mark S. Koppelman, Southfield, Mich., for Thomas Fortin and Paul Hebert.

Bruce Franklin, Troy, Mich., for Maquire.

Samuel M. Thompson, pro se.

Kevin A. McNulty, Detroit, Mich., for Nosh Ivanovic and Katrina Ivanovic.

Abraham Singer, Detroit, Mich., for Scott Babin.

Thomas W. Crammer, Bloomfield Hills, Mich., for F. Hammonds.

Kevin F. O'Shea, Detroit, Mich., for Peggy Babin.

James V. Carnago, Laura M. Beam, Troy, Mich., for Century 21 and John D. Kersten.

OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### INTRODUCTION

This matter is before the Court on cross-motions filed by several of the parties in this multi-plaintiff, multi-defendant lawsuit. Plaintiff Michigan Protection and Advocacy Service ("MPAS")[1], on behalf of fourteen Plaintiffs suffering from developmental disabilities, brings this action against fourteen Defendants. MPAS claims that Defendants have violated rights secured by the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. § 3601 et seq.[2], and the Michigan Handicapper's Civil Rights Act, M.C.L. § 37.1101 et seq., and for conspiracy to violate those rights under 42 U.S.C. § 1985(3), and failure to prevent this conspiracy under 42 U.S.C. § 1986. Plaintiffs seek declaratory and injunctive relief together with compensatory and punitive damages.

### STATEMENT OF FACTS

In May 1988, Robin and Marie Hester ("Hesters") decided to sell their home at 2323 24 Mile Road in Shelby Township, Michigan ("the Home"). They signed an Exclusive Right–To–Sell Listing Agreement with Defendant Century 21 Town & Country ("Town & Country"). Defendant Florence Hammonds ("Hammonds"), a real estate agent employed by Town & Country, handled the listing which was to run from May 1, 1988 through August 1, 1988. In consideration for undertaking to find a purchaser, the Hesters agreed to pay Town & Country 6% of the sales price of the property as a commission.

Thereafter, Hammonds began marketing the property. This effort was unsuccessful. When the first listing expired, the Hesters signed another exclusive listing agreement which ran until November 3, 1988. Again, the effort to sell the Home was unsuccessful. The Hesters then signed a third listing agreement which ran until February 10, 1989.

On February 9, 1989, Hammonds offered to purchase the Home for $95,000, with a sales commission of $5700 to Town & Country. This offer was accepted. The closing took place on or about April 12, 1989 with Transamerica Title Insurance Company ("Transamerica") providing the title work. To pay for the Home, Hammonds secured a home equity loan of approximately $21,000 and a $78,000 mortgage. Her monthly payment on this mortgage was about $1100, with the first payment due in May 1989. According to Hammonds, the assumption of this second mortgage was a substantial financial burden.[3]

Apparently, Hammonds decided to buy the Home with the intent to lease it to the State of Michigan to be used as a group home for mentally handicapped adults.[4] In November 1988, while acting as the Hesters' broker, she had inquired whether the Macomb–Oakland Regional Center ("MORC")—a division of the Michigan State Department of Mental Health ("State")—would be interested in leasing the Home if she were to purchase it. MORC was interested and a series of discussions with representatives from the State ensued. According to Hammonds,

---

**1.** MPAS is a nonprofit, private corporation designated by the Governor of the State of Michigan pursuant to the Developmental Disabilities and Bill of Rights Act, 42 U.S.C. § 6000 et seq., and the Protection and Advocacy for Mentally Ill Individuals Act of 1986, 42 U.S.C. § 10801 et seq., to protect and advocate for and on behalf of individuals with developmental disabilities and/or mental illnesses.

**2.** The FHAA is the 1988 amendment to the Fair Housing Act ("FHA") (Title VIII of the Civil Rights Act of 1968). The FHAA, among other modifications, expanded the coverage of the FHA to reach families with children and the handicapped.

**3.** Plaintiffs dispute that the mortgage was a financial burden.

**4.** Hammonds's son is alleged to be mentally handicapped but is now serving in the Marines. Hammonds intended that the Home be leased to the State in tribute to his efforts to overcome his handicap.

she was assured by the State in March 1988, through Don Booth, MORC's Property Development Coordinator, that a written lease would be executed and that she would begin receiving rental payments by May 15, 1989.[5] Hammonds claims that she bought the Home in reliance on this promise to lease.

Hammonds says there were numerous delays involved in her lease negotiations with the State, including the frequent illness of her contact person. The State also refused to commit to the amount of rent which would be paid on the Home. In response to these difficulties, Hammonds called her contact person's supervisor on or about April 28, 1989, asking him to intercede so as to accelerate the leasing process. He responded that he could not intercede, that the approval for the home had to go through different channels, including the Attorney General's office, and that the Home would not be ready to lease until at least July 15, 1989.

On May 12, 1989, Hammonds met with Booth and Dennis Bott, MORC's first line supervisor, to discuss her concerns about the rental of the Home, including the financial burden and the negative reaction from neighbors. According to Hammonds, at the conclusion of this meeting, Booth and Bott promised to contact Lansing to determine the reason for the delays and to call her that day with a response. They did not call her.

Meanwhile, on April 26, 1989, a MORC representative had sent residents in the vicinity of the proposed group home a letter informing them that the Home was to be used as a residence for five mentally retarded adults. The letter describes the program and advises interested persons to call MORC if they have any questions.[6] In response, Defendant Peggy Babin, a resident living near the Home, called Hammonds on or about April 28, 1989. She was upset about the prosect of a group home, and, along with other neighbors, wished to speak with Hammonds about it. Five neighbors met at Hammonds's home the next day. They voiced their fears about the home and gave Hammonds a packet of negative information about group homes. Hammonds apparently assured them that the group home was a good idea and tried to assuage their fears.

A group of neighbors then began to engage in activities designed to prevent the institution of the group home in their neighborhood. They apparently believed that a group home would result in a depreciation of property values and threaten neighborhood safety. According to Plaintiffs, this group initiated a petition drive opposing the Home, arranged for media coverage of their opposition drive, threatened a boycott and picket of the Town & Country office where Hammonds worked [7], and prepared and distributed packets of information detailing negative aspects of group homes. Plaintiffs add that Peggy Babin arranged for a public hearing on the subject of group homes to be held at the Shelby Township Hall on May 12, 1989. Peggy Babin counters that she arranged the meeting in conjunction with MORC. This meeting attracted almost 100 people, including MORC representatives, and was the scene of intense discussion and argument.[8]

On Friday, May 13, 1989, Defendant Nosh Ivanovic, who owned the house adjacent to the Home [9], called Hammonds and offered her $100,000 for the Home.[10]

5. Plaintiffs dispute this claim.

6. According to Plaintiffs, this letter can be construed as being discriminatory and in violation of civil rights laws.

7. Defendants Scott and Peggy Babin deny that they threatened a picket or boycott. However, Hammonds, in her deposition, indicates, albeit equivocally, that some neighbors threatened to picket her office.

8. Hammonds did not attend the meeting.

9. Mr. Ivanovic continues to own this home which he now leases.

10. Apparently, the Ivanovics had offered the Hesters $95,000.00 for the Home at about the same time the Hesters agreed to sell it to Hammonds in February 1989. The Hesters said, without explanation, that they would rather sell the Home to Hammonds. On March 25, 1989, after the completion of the purchase agreement between Hammonds and the Hesters, but before the closing, a representative from another real

Hammonds responded that she would think about it. On Monday, May 15, 1989, Hammonds made a counteroffer of $104,000 which was accepted. Hammonds claims that she waited until Monday because she had expected to receive a phone call from Bott or Booth on Friday, May 12, 1989, after her meeting with them. When they failed to call on Friday, as promised, and when they did not return her calls on Monday, she decided to accept the Ivanovics' offer. The closing took place on May 19, 1989 at Transamerica.

Hammonds testified that she sold the Home to the Ivanovics because she feared that the State would not timely negotiate the rental of the Home and that she would thus be unable to make the mortgage payments on the Home. Plaintiffs dispute this and contend that the sale was at least partially motivated by the public opposition to the group home and fear that the sale of the Home to MORC would negatively affect Hammonds's employment as a broker.

Nosh and Katrina Ivanovic needed approximately $5000 to consummate the purchase of the Home from Hammonds. Defendant Scott Babin gave them this sum. To recoup this disbursement, he then solicited money from some neighbors, including Defendants Paul Hebert, Thomas Fortin, Peggy Babin, Michelle Rhodes, and Alan

Rhodes.[11] Scott Babin is accused of contributing approximately $5000.00 to the Ivanovics and then soliciting money from Hebert. Peggy Babin is accused of soliciting and collecting money from the Rhodes. Hebert is accused of soliciting money as well as contributing an undisclosed amount toward the purchase of the Home. Finally, Fortin is accused of contributing $500.00 to Hebert toward the purchase of the Home. Apparently, the Ivanovics never repaid Scott Babin.

MPAS filed the Complaint on January 23, 1990.[12] On December 17, 1991 and December 19, 1991, the Court heard oral argument on the parties' motions. On January 6, 1992, the Court entered an Order permitting supplemental briefs on the question of the constitutionality, under the Commerce Clause, of the FHAA as it pertains to the alleged activities. The Court received briefs from Plaintiffs, the United States Department of Justice, as *amicus curiae*, and Defendants Peggy Babin and Maguire and Shelby Township.

Currently before the Court for consideration are cross-motions for summary judgment filed by Plaintiff MPAS and Defendants Peggy Babin, Hammonds, Nosh and Katrina Ivanovic, Kersten/Town & Country[13], Thomas Fortin ("Fortin"), Joseph Maguire ("Maguire") and Shelby Township.

estate broker called Hammonds on behalf of the Ivanovics and offered to purchase the Home for $97,000.00. Thus, the Ivanovics expressed their desire to purchase the Home before it became known to the neighbors that the Home might be utilized as a group home.

**11.** On January 22, 1992, Alan and Michelle Rhodes were dismissed from this case with prejudice pursuant to a joint stipulation.

**12.** The Court rejects, at the outset, claims that MPAS lacks standing to sue on behalf of the Plaintiffs. It was clearly the intention of Congress that the MPAS and other similar advocacy groups represent and, if necessary, litigate on behalf of individuals suffering from developmental disabilities. Title 42 U.S.C. § 10801 states in relevant part:
 (b) The purposes of this chapter are—
 (1) to ensure that the rights of mentally ill individuals are protected; and
 (2) to assist States to establish and operate a protection and advocacy system for mentally ill individuals which will—

(A) *protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes;* and
(B) investigate incidents of abuse and neglect of mentally ill individuals if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred. 42 U.S.C. § 10801(b) (emphasis added). *See also* 42 U.S.C. § 6042(a).

**13.** In the Plaintiffs' pleadings and motion, Kersten and Town & Country are referred to as one entity. Kersten objects to this characterization and claims that principles of corporate law prohibit a separate claim against him. Specifically, he claims the Plaintiffs have failed to "pierce the corporate veil." *Laborer's Pension Trust Fund v. Sidney Weinberger Homes, Inc.,* 872 F.2d 702 (6th Cir.1988). In the context of this Opinion, the Court need not address the individual identities of the two Defendants.

Although the presence of cross-motions for summary judgment does not necessarily indicate that there are no genuine issues of material fact[14], the Court finds that the factual disputes which do exist and are noted in the statement of facts are not material to a resolution of the legal issues in this case. Therefore, the Court will rule on the legal issues presented by the parties.

## STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lower the movant's burden on a summary judgment motion.[15] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. The relevant principles can be summarized as follows:

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the above principles to the following discussion.

## FAIR HOUSING ACT CLAIMS

The Complaint asserts a number of different claims against the fourteen Defendants. This Opinion will discuss these various claims by focusing on the acts that provoked them. The relevant acts can be condensed into four main categories:

I. Hammonds' sale of the Home.

II. Participation of Kersten/Town & Country in this sale.

---

**14.** *See* 10A Wright, Miller, Kane, *Federal Practice and Procedure* § 2720 (2d ed. 1983).

**15.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Wright, Miller, Kane, *Federal Practice & Procedure*, § 2727 (1991 Supp.).

III. Protest activities of the neighbors.

IV. Activities of the neighbors in (a) purchasing the Home and (b) soliciting, collecting, and contributing money for the purchase of the Home.

The Court will address the legal and constitutional issues implicated by the facts of this case and Plaintiffs' claims.

## I. HAMMONDS' SALE OF THE HOME

Plaintiffs assert that Hammonds violated the FHAA when she sold the Home to the Ivanovics. Specifically, they say that she sold the Home for financial gain to people whom she knew were actively opposed to its use as a group home. This, they say, was a discriminatory act which violated § 3604(f)(1), § 3605, and § 3617 [16] of the FHAA.

### A. *42 U.S.C. § 3604(f)(1)*

Florence Hammonds, as the owner of the Home, is clearly within the purview of the language of § 3604(f)(1) which makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap...." [17] However, before advancing to a substantive analysis of this section, the Court must determine whether § 3604(f)(1) applies to Hammonds or whether she is exempted from that section by § 3603(b)(1).

Section 3603(b)(1) exempts from FHAA coverage single family homes that are sold or rented by the owner if: (1) the owner owns three or fewer such homes; (2) the owner does not live in, and was not the most recent occupant of, the home, and the owner has not made a similar sale within twenty-four months; (3) the home was sold or rented without the aid of a real estate broker, agent, or any person in the business of selling or renting dwellings; and (4) the home was sold or rented without the aid of a written notice which violates § 3604(c). [18]

Both the language and legislative history of § 3603(b) [19] indicate it was an attempt to balance two important principles—the individual homeowner's right to dispose of his private property as he sees fit without the interference of the federal government and the right of a homeseeker to be free from overt or covert discrimination. The limitations on the application of the exemption relate to the number of homes rented or sold and the use of a broker or advertising in furtherance of an attempt to sell or rent the dwelling. This indicates a congressional desire to provide an exemption only for those homeowners operating in purely non-professional manner—that is, not acting as professionals or retaining a professional on their behalf. Although it enacted a comprehensive anti-discrimination schema, Congress wished to guarantee an individual homeowner the control over his property. This balance is reflected in a comment by Senator Baker:

> First, I do not feel that the balance of equities in this country should lead us to the regimentation and the absolute control of how an individual homeowner may or may not dispose of his property.

> Second, I feel that it should be the express purpose of Congress and of the Government to produce equality of fair housing opportunity to the maximum possible extent, after giving credence to the idea that the individual homeowner has some right to decide how, when, and to whom he sells his house.

> (B) a person residing in or intending to reside in that dwelling after it is so sold, renter, or made available; or
> (C) any person associated with that buyer or renter.

---

**16.** To avoid redundancy, the claims against Hammonds under § 3617 will be discussed below with the § 3617 claims against the other Defendants.

**17.** Section 3604(f)(1) provides that it shall be unlawful:

> (f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—
> (A) that buyer or renter,

**18.** The Court notes that the § 3603(b)(1) exemption does not apply to charges against Hammonds under § 3605(a) and § 3617. *See infra.*

**19.** Section 3603(b)(2) exempts those units occupied by four or fewer families when the owner is the resident of one of the units.

114 Cong.Rec. at § 2239 (daily ed. Mar. 5, 1968).

There is no dispute that Hammonds satisfies the first, second, and fourth conditions above. However, Plaintiffs allege that Hammonds fails to satisfy the third condition because: (1) she is a real estate agent and (2) she utilized the services of a broker by (a) seeking advice from Defendant Kersten and (b) employing the services of Kersten and Town & Country to close the sale. The Court will examine these claims seriatim.

■ It is undisputed that Hammonds is a real estate agent. The more pertinent question, however, is whether being a real estate agent precludes her from benefiting from the exemption when, as in the instant case, she sold the Home in her personal capacity. The relevant portion of § 3603(b) provides:

> any such single-family house shall be excepted from the application of this subchapter only if such house is sold or rented (A) without the use in any manner of the sales or rental facilities or the sales or rental services of any real estate broker, agent, or salesman, or of such facilities or services of any person in the business of selling or renting dwellings, or of any employee or agent of any such broker, agent, salesman, or person

42 U.S.C. § 3603(b)(1).

Plaintiffs claim that, as a broker, Hammonds necessarily used a broker (herself) to consummate the sale; therefore, she may not benefit from the exemption. Under this interpretation, § 3603(b) would render nonexempt all private [20] transactions by persons in the real estate business. However, this would be inequitable as it would deprive these individuals of a statutory exemption solely because of their occupation. As the Court does not believe that Congress intended that the exemption be denied a person solely because of his occupation, it will not hold that Hammonds is precluded from benefiting from § 3603(b) simply because she happens to be a real-estate agent.[21]

■ Plaintiffs' next argument is that Hammonds used the services of Kersten and Town & Country to effectuate the sale. This argument actually has two parts. The first "use of services" allegedly occurred when Hammonds sought the advice of Defendant Kersten in the Town & Country office in connection with the opposition activities of the neighbors. However, review of the record indicates that Hammond's encounter with Kersten was a brief and incidental discussion in which Kersten told Hammonds that Hammonds would have to handle the situation herself. During deposition testimony on this interaction, Kersten said: "I vaguely remember. Probably the implication was what a mess we're in, I'm in or whatever. I was very empathetic and left it like that. Believe me, that discussion lasted fifteen seconds."

The second alleged use of services occurred when Hammonds utilized closing documents bearing the Town & Country logo. As discussed below, the relevant documents used by Hammonds were pre-printed with Kersten's signature, but were otherwise devoid of any mention of a real-estate broker. Further, neither Hammonds nor Town & Country received any commission for the sale, nor was the Home listed.[22] In sum, there is no evidence that Hammonds operated in conjunction with Town & Country in the sale of the Home to the Ivanovics. Therefore, under § 3603(b)(1), Hammonds is exempt from § 3604(f)(1).

---

**20.** As used in this Opinion in the context of a housing transaction, the word "private" refers to an exchange of property between two individuals without any outside aid or interference, whether from brokers, a government, or an advertising source.

**21.** The Court also notes that in describing those persons who are to be considered "in the business of selling or renting dwellings," Congress specifically limited the application of to a person who acts as an agent *"other than in the sale of his own personal residence."* 42 U.S.C. § 3603(c). This indicates a congressional intent not to reach those in the real estate business who are acting in their personal, as opposed to official, capacity.

**22.** The agreement of sale between the Ivanovics and Hammonds has "N/A" marked in that section of the agreement reserved for the terms of the broker's commission.

■ However, even were the Court to find Hammonds nonexempt, it would still conclude that she did not violate § 3604(f)(1) because Plaintiffs have failed to establish a prima facie case of discrimination against her.

■ Plaintiffs assert that Hammonds's sale of the Home to the Ivanovics had a discriminatory effect and a discriminatory intent. The Court rejects at the outset any claim that the sale had a discriminatory effect. Although the Sixth Circuit has stated that discriminatory impact may be sufficient to violate the FHA, *Arthur v. Toledo,* 782 F.2d 565 (6th Cir.1986), discriminatory impact cases generally involve facially neutral *policies* or *laws* that have a significant statistical effect of disfavoring members of a protected class. *See Southend Neighborhood Improv. Ass'n v. County of St. Clair,* 743 F.2d 1207, 1209 (7th Cir.1984) (noting that not every action which produces discriminatory effects is illegal); *Betsey v. Turtle Creek Associates,* 736 F.2d 983 (4th Cir.1984) (noting statistical impact of new all-adult policy); *Bronson v. Crestwood Lake Section 1 Holding Corp.,* 724 F.Supp. 148, 154–55 (S.D.N.Y. 1989) (holding that rental policies had statistically disproportionate impact). *See also* Robert G. Schwemm, *Housing Discrimination Law and Litigation* § 10.-4(2)(b) (1991) ("Schwemm"). Here, in contrast, there is no policy or law at issue. Rather, Plaintiffs complain about a single allegedly discriminatory transaction. As such, the scope of this case is too narrow to qualify as one involving a discriminatory impact. The Court will review Plaintiffs' § 3604(f)(1) claim as a discriminatory intent claim.

In analyzing claims of discriminatory intent, courts often borrow from the analysis used in Title VII cases. *Selden Apartments v. U.S. Dept. of Housing & Urban Dev.,* 785 F.2d 152, 159 (6th Cir.1986); *Shaw v. Cassar,* 558 F.Supp. 303, 312 (E.D.Mich.1983); *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1036–37 (2d Cir. 1979). Under the analysis established by the Supreme Court in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 801–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), the plaintiff must initially establish a prima facie showing of discrimination.[23] If he establishes a prima facie case, the defendant must respond with a legitimate, nondiscriminatory reason for the denial of housing. If the defendant does so, the plaintiff must then prove that that reason is pretextual. *Id.*

■ The Court will adopt the basic approach of the *McDonnell Douglas* Court and will determine whether Plaintiffs have established a prima facie case of discrimination against Defendants. In *Hamilton v. Svatik,* 779 F.2d 383 (7th Cir.1985), the Seventh Circuit established a test for determining whether a prima facie case of housing discrimination has been established. Under that test, a plaintiff must demonstrate the following:

(1) plaintiff belongs to a protected class of persons;

(2) the defendant was aware of it;

(3) the plaintiff was ready and able to accept defendant's offer to rent or buy; and

(4) the defendant refused to deal with the plaintiff.

*Id.* at 387.[24]

There is no dispute as to the first, second, and fourth prongs of the test. Plain-

---

**23.** The *McDonnell Douglas* Court described the prima facie test as follows:

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer

continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

**24.** Plaintiffs actually propose a prima facie test based on that used in *McDonnell Douglas:*

In the present case, the facts supporting the prima facie case would be: The individual Plaintiffs are persons with mental retardation protected by the FHAA; they were available

tiffs are handicapped and Hammonds was aware of this. Moreover, Hammonds sold the Home to the Ivanovics and thereby denied Plaintiffs the opportunity to own the Home. However, Plaintiffs have more difficulty proving the third prong. To successfully do so, they must demonstrate that MORC was ready, willing, and able to lease the Home before May 15, 1989, the date on which the Ivanovics purchased the Home.[25]

The record demonstrates that Plaintiffs (actually, their agent) were neither ready nor able to consummate a lease on the Home.[26] In fact, it is clear from the record that the parties never got beyond the negotiation stage. Plaintiffs admit that as of May 15, 1989, when Hammonds sold the Home to the Ivanovics, Hammonds and the State were still involved in lease negotiations.[27] Hammonds has offered affirmative evidence, in sworn testimony, that she was never given a commitment by the State:

> After I purchased the House, the State began delaying the occupancy date of the group home and the date on which rental payments would begin. The State finally told me that lease payments would begin no earlier than July 15, 1989. Nonetheless, the State would not guarantee this date and the State refused to reduce any agreement to writing. The State absolutely refused to commit to any lease terms, including the amount of rent I would receive or when the payments would begin.

Deposition testimony on this point similarly indicates that the State was not ready and able to purchase the Home:

Q. Or tell us in your own words exactly the basis for your decision to sale [*sic*] to the Ivanovics.

A. [HAMMONDS] I had made a commitment to refinance my home to proceed with a lease agreement with MORC. And when I realized that the lease negotiations were not proceeding in the fashion or the promised time, than I decided to sell the home because I realized that the home wasn't marketable, it wasn't a marketable home. And I had a ready, willing, and able buyer. And that's when I made my decision to sale [*sic*] to them.

Q. Had MORC ever produced for you a written lease agreement?

A. No; nor the state.

Q. All right. Is that what you were asking them to provide you?

A. Yes, I was.

Plaintiffs have failed to submit to the Court any evidence that the MORC was ready, willing, and able to satisfy the financial conditions of the lease.

---

for placement in a group home; *the house in which they may have been placed was made unavailable to them by the Defendants' actions* causing a delay in their placement; the anticipated residence was subsequently occupied by persons not in the same protected group. (Emphasis added.)

Even under the Plaintiffs' test, the Plaintiffs have failed to establish a prima facie case of discrimination. Specifically, they have failed to demonstrate that "the house in which they may have been placed was made unavailable to them *by the Defendants' actions*" (emphasis added). As discussed *infra,* during the relevant time period, Plaintiffs, through their designated state agency, were not prepared to lease the Home. As such, the Home was actually made unavailable to them by the state agency's inaction in failing timely to lease the Home, as opposed to any action taken by the Defendants.

25. The Court observes that this "ready and able" prong of the test is reflected in the *McDonnell Douglas* test. Under *McDonnell Douglas,* the plaintiff must demonstrate that he was qualified to have the position. *McDonnell Douglas,* 411 U.S. at 801–03, 93 S.Ct. at 1824. In other words, he must show the court that he was ready and able to take the job.

26. At oral argument, Plaintiffs said that the focus of the ready, willing, and able analysis should be the Plaintiffs themselves as opposed to MORC, their representative. The Court does not accept this argument. In the housing context, the ready, willing, and able analysis clearly refers, in the housing context, to *financial* readiness. The Court does not doubt that the individual Plaintiffs could have physically occupied the Home. This, however, is irrelevant.

27. In their Complaint, Plaintiffs charge Hammonds with "aborting lease *negotiations*" (emphasis added). Further, an affidavit by Booth notes that as of May 12, 1989, Hammonds and the State were still involved in "lease *negotiations*" (emphasis added).

Plaintiffs counter that the State was ready and able to accept Hammonds offer to rent. In support, they say:

Defendant had already negotiated a sale price for the property before fulfilling *her commitment to MORC.* On May 9, 1989, MORC informed her that bids were required for physical plant changes for fire safety purposes. The process was ongoing as *the state had accepted her offer to rent* months earlier. She had affirmative duties to her lessee to enable persons with mental retardation to live at the premises.

(Emphasis added.) To the extent that this statement relates to the State's readiness to lease, Plaintiffs appear to be stating, contrary to their claim in the Complaint, that the State had already made a commitment to lease the Home and that the delay between commitment and the payment of rent was caused by necessary "physical plant changes for fire safety purposes."

This position is problematic. The record reveals that although MORC was interested in leasing the Home, it never expressed an unequivocal acceptance of Hammonds's offer. Restatement (Second) Contracts § 57.[28] In fact, the parties had not even reached the offer/acceptance stage. The undisputed evidence reveals that, before she purchased the Home, Hammonds had made a general proposal about the establishment of a group home to which the State responded favorably. The parties then began to focus on the feasibility of the lease in view of administrative restrictions imposed by the State on such residences.

However, there is no mention in the record of a discussion between the parties of lease amounts or duration. The transaction appears to have been stymied by bureaucratic delays related to the physical configuration of the Home. In the May 9, 1989 communication about physical modifications to the Home, referred to in the above quoted clause, Booth writes:

*We are progressing with developing a lease for your home.* As part of fulfilling the lease commitment, bids are required for fire safety physical plant changes. The following contractors will be contacting you in the near future for property review as it pertains to the attached list of bid specifications.

\* \* \* \* \* \*

These contractors will submit to me their final bids. I will review and choose the low bidder. *Work will commence when the lease has been fully approved.*

(Emphasis added.) This letter indicates that as of May 9 the State was only in the process of *developing* a lease for the Home. Before it could proceed, it needed to (a) have three listed contractors inspect the Home, (b) receive final bids from these contractors, and (c) choose the low bidder. Only at this point would the State be able to advance to the final stage of lease negotiation. In other words, as of May 9, 1989, only the preliminary steps of the leasing process had been completed. However, Hammonds claims that the State had promised that rental payments would commence by May 15, 1989.[29]

**28.** As provided in comment b. to § 57, "Where notification is essential to acceptance by promise, the offeror is entitled to know in clear terms whether the offeree accepts his proposal. It is not enough that the words of a reply justify a probable inference of assent."

**29.** Plaintiffs attempt to analogize this case to a Second Circuit decision, *People by Abrams v. 11 Cornwell Co.,* 695 F.2d 34 (2d Cir.1982), in which a state agency planned to purchase a house to serve as a community residence for retarded adults. Dealing through a real estate agency, the state offered the owner $135,000.00. This offer was accepted. Upon learning of the purpose of the house, a group of neighbors formed a partnership which purchased the house for $122,500.00. The neighborhood

group then advertised the house for sale below market price as a single family unit but repeatedly refused offers from the state agency. The court held that the group had violated the civil rights of the mentally handicapped individuals under 42 U.S.C. § 1983(3) even though the state had not yet signed a written contract to purchase the house.

In *Abrams,* the state sued the neighbors, but did not sue the owner of the house. Therefore, *Abrams* is not applicable as to Hammonds. In fact, *Abrams* is inapposite even *as to the other* Defendants. In *Abrams,* the parties had already negotiated and agreed on a price and an offer had been made and accepted. Therefore, the parties in that case had an oral contract. Here, in contrast, the State not only failed to agree on

■ Plaintiffs have had a generous amount of time for discovery and are still unable to establish that MORC was ready and willing to lease the Home. This is an essential element of a prima facie case of discrimination under the FHAA. A seller should not be required to keep a home on the market without a contract while waiting for a prospective buyer to decide to purchase or lease it. The Plaintiffs' status as a "protected group" does not magically alter this basic principle. As noted by the Second Circuit:

> A landlord in the private sector is entitled to choose whom he will accept as tenants as long as he does not discriminate on one of the statutorily condemned bases. Certainly he may seek assurance that prospective tenants will be able to meet their rental responsibilities. "[T]here is no requirement that welfare recipients, or any other individuals, may secure apartments ... without regard to their ability to pay."

*Boyd v. Lefrak Organization,* 509 F.2d 1110, 1114 (2d Cir.) (quoting *Male v. Crossroads Assoc.,* 469 F.2d 616, 622 (2d Cir. 1972)), *cert. denied,* 423 U.S. 896, 96 S.Ct. 197, 46 L.Ed.2d 129 (1975) (footnote and citation omitted). *See also Dreher v. Rana Management, Inc.,* 493 F.Supp. 930, 934–35 (E.D.N.Y.1980) (noting that private landlord may enter into a superior economic arrangement even if that arrangement disproportionately affects minority tenants).

The Court holds that Hammonds did not violate § 3604(f)(1).

### B. *42 U.S.C. § 3605*

■ Plaintiffs next allege that the sale of the Home violated § 3605 which prohibits a person engaged in the real estate business from participating in discriminatory real estate transactions. The statute reads:

> It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3605.

This statute does not apply to Hammonds. Although a real estate agent, Hammonds was acting in an exclusively personal posture when she bought and sold the Home. *See supra.* Section 3605, which applies to brokering, home loans, financial assistance, "redlining," appraisals, and the secondary mortgage market, does not expand the coverage of the FHAA to reach persons acting in their personal capacity, even if those persons happen to be involved in the real estate business.[30]

Further, even if § 3605 did apply to Hammonds, the Court would not hold that Hammonds violated that section because it finds, as noted, that Plaintiffs have failed to establish a prima facie case of discrimination against Hammonds. Thus, for the same reasons that the Court rejected the § 3604(f)(1) claim against Hammonds, it rejects the § 3605 claim as well.

### II. PARTICIPATION OF KERSTEN/TOWN & COUNTRY IN THE SALE

Plaintiffs allege that Town & Country (1) is the real estate agency through which the Home was sold, thereby making it unavailable to Plaintiffs because of their handicaps, and (2) as a principal, is responsible under the doctrine of respondeat superior for the allegedly discriminatory actions of Hammonds, its agent.

■ As support for the argument that Town & Country assisted in the sale, Plaintiffs refer to the settlement statement and closing statement, both of which were printed on official Town & Country forms and were signed by John Kersten above the words, "John Kersten, Broker." Plaintiffs

---

a monthly rent, but had not yet even committed to renting the Home.

**30.** On this point, one commentator noted that much of § 3605 clarifies protection already provided under § 3604. Robert G. Schwemm, *Housing Discrimination Law and Litigation* § 18.4(1) (1991).

add that even if the closing documents were signed in advance (which they do not admit), the forms provided official sanction for the allegedly illegal transfer.

As noted, the evidence of record indicates that Town & Country did not in any way assist in the sale of the Home to the Ivanovics, and that Hammonds purchased the Home in her individual capacity. There were two distinct transactions in this case. First, the Hesters sold the Home to Hammonds ("sale 1"). Second, Hammonds sold the Home to the Ivanovics ("sale 2"). It is undisputed that sale 1 was consummated with the full assistance and participation of Town & Country. However, all evidence suggests that sale 2 was made without the participation or assistance of Town & Country. At the time of sale 2, the Home was not listed with Town & Country, Town & Country received no commission from the sale; the closing documents make no mention of Town & Country (indeed, no broker at all is mentioned). In addition, affidavits from Kersten and Hammonds indicate that neither Kersten nor Hammonds considered Town & Country to be in any way involved in the sale of the Home to the Ivanovics.

The closing documents are the only evidence that Town & Country was involved in the sale. Several of these documents contain a Town & Country logo as well as the signature of Kersten. However, as noted by Town & Country, Transamerica prepared the closing documents for sale 2. Transamerica insures approximately 2000 sales per year on behalf of Town & Country, and thus the Town & Country documents are presigned by Kersten for the sake of convenience. In his affidavit, Bernard Youngblood, Detroit regional manager of Transamerica, states the following: "As a matter of course, in the numerous transactions in which our company insures title for customers of Century 21 Town & Country, John R. Kersten's name is affixed as drafter of documents of conveyance." This fact is further supported by the affidavit of Patricia Lisaius, manager of the Sterling Heights office of Transamerica. Plaintiffs do not dispute this point.[31] In fact, Plaintiffs offer no solid evidence that Town & Country was involved in sale 2. Therefore, the Court rejects Plaintiffs' claim that Town & Country assisted in the sale of the Home to the Ivanovics.

■ Plaintiffs' next claim rests on the doctrine of respondeat superior. They say that Town & Country, as a principal, is responsible for the actions of Hammonds, its agent, whether or not it condoned or furthered this conduct. In support, Plaintiffs cite a string of cases standing for the proposition that a real estate agency (or like entity) is responsible for the discriminatory acts of its employees, even if the agency was innocent of the discriminatory acts. *Green v. Century 21*, 740 F.2d 460 (6th Cir.1984); *Marr v. Rife*, 503 F.2d 735 (6th Cir.1974); *Sanborn v. Wagner*, 354 F.Supp. 291 (D.Md.1973); *Williamson v. Hampton Management Co.*, 339 F.Supp. 1146 (N.D.Ill.1972); *Bradley v. John M. Brabham Agency, Inc.*, 463 F.Supp. 27 (D.S.C.1978); *Harrison v. Otto G. Heinzeroth Mortg. Co.*, 430 F.Supp. 893 (N.D.Ohio 1977).

The Court agrees that a real estate agency is generally liable for the misdeeds of its agents. However, the facts of the above respondeat superior cases are distinguishable from the instant case. In the above cases, the discriminatory act occurred while the employee was acting in his official capacity as a real estate agent. In other words, liability was premised on a finding that the agent was acting within his authority and thus the agency had *control over* his acts. *See* Restatement (Second) Agency § 140; *Marr*, 503 F.2d at 742 ("As owner of the agency, Rife had at least the power to control the acts of his salesmen"); *Bradley*, 463 F.Supp. at 31 ("Thus an agent with [owner's] authority could contract to sell a house and bind the principal").

31. Plaintiffs say, "'So what?' Has defendant ever once alleged that the use of these documents was unauthorized?" This response is inapposite. Even if Town & Country authorized Hammonds to use its preprinted closing documents, this would in no way show that it assisted in sale 2.

In the instant case, however, there is no evidence to suggest that Hammonds was acting within her authority as agent when selling the Home to the Ivanovics. Nor is there any evidence that Town & Country had control over her acts. Rather, the evidence shows that Hammonds was acting wholly in her individual capacity. In this capacity, she was neither the agent of, nor controlled by, Town & Country. Therefore, the above cases are inapposite and Town & Country cannot be held liable as principal for the allegedly discriminatory act of Hammonds.

Having found that Town & Country (1) did not participate in the sale of the Home to the Ivanovics and (2) was not acting as a principal in the transaction, the Court holds that Town & Country is not liable under § 3604(f)(1).[32]

## III. PROTEST ACTIVITIES OF THE NEIGHBORS

Plaintiffs make a series of claims against those persons living in the vicinity of the Home who engaged in protest activities and contributed money to purchase the home. This group includes: (1) Peggy Babin; (2) Scott Babin; (3) Thomas Fortin; (4) Paul Hebert; (5) Nosh Ivanovic; and (6) Katrina Ivanovic. For ease of reference, the Court will refer to this group as "the Neighbors." The Neighbors allegedly engaged in two distinct types of prohibited activity. First, they protested against the institution of a group home in their neighborhood by (a) distributing inflammatory material portraying negative incidents associated with group homes, (b) writing letters to Town & Country and MORC in opposition to the group home and soliciting others to write similar letters, (c) attempting to persuade Hammonds not to rent the Home to the State, and (d) allegedly threat-ening to picket Town & Country should Hammonds not desist in efforts to rent to the State.[33] Second, they solicited, collected, and contributed money for the purpose of ensuring that the Ivanovics would purchase the Home. The Court will separately examine these activities. In this section, the Court examines only the protest activities of the Neighbors which, Plaintiffs say, violated § 3604(f)(1), § 3604(e), § 3604(c)[34], and § 3617 of the FHA.

### A. 42 U.S.C. § 3604(f)(1)

■ Before addressing the substantive allegations against the Neighbors, the Court must determine whether the Neighbors are subject to claims under § 3604(f)(1). The relevant portion of § 3604(f)(1) states that it shall be unlawful to (1) discriminate in the sale or rental of a dwelling or (2) make unavailable a dwelling because of the prospective purchaser's handicap. The first part of the section explicitly refers to those who discriminate in the sale or rental of a dwelling and therefore implicates only the owner of a dwelling or his agent.

The second part of § 3604(f)(1) applies to those who "otherwise make unavailable" a dwelling. Although this phrase has been referred to as a "catchall," Schwemm § 13.4(1), its scope is not limitless. By its terms, it is limited to those individuals who are in a position to make a dwelling unavailable. To be in this position, a person must be able to exercise influence over or control the disposition of the dwelling. Without this power, the person might be able to annoy a prospective tenant, but would be unable to make a dwelling unavailable.

Plaintiffs, however, ask the Court to expand the meaning of "otherwise make unavailable" to encompass those who indirect-

---

**32.** Plaintiffs also accuse Kersten and Town & Country of violating § 3605 of the FHA. As noted above, this section forbids an entity or individual in the real-estate business from discriminating on the basis of race, color, religion, etc. For the same reasons that the Court finds that Kersten and Town & Country were not susceptible to suit under § 3604(f)(1), the Court finds that they are not liable under § 3605.

**33.** Not all of the Neighbors engaged in each of the above activities. However, for the purposes of this analysis, it is unnecessary to delineate the specific acts attributable to each neighbor.

**34.** The 3604(c) claim against Joseph Maguire, Shelby Township's supervisor, will be included in this section.

ly deprive a protected individual of housing. Under this interpretation, any person whose act eventually causes the denial of housing could be liable under the FHAA. For example, a competing buyer who outbids a member of a protected group would be liable under the statute in that he made the dwelling unavailable. Similarly, a journalist whose negative portrayal of retarded people might result in the denial of a dwelling to a retarded person would be liable in that he made the dwelling unavailable through his writing.

Clearly, Congress did not intend to cause such a procrustean result. Rather, it intended the phrase "otherwise make unavailable" to cover only those persons who, though not an owner or his agent, are in a position directly to deny a member of a protected group his housing rights.

Several courts have limited the application of § 3604(f)(1) to those persons who directly deprive of housing a member of a protected class. A Seventh Circuit decision, *Burrell v. Kankakee*, 815 F.2d 1127 (7th Cir.1987), found no FHA violation when a city allegedly failed to process rent subsidies on time. As one of several reasons, the court said: "In any event, plaintiffs claims are not cognizable under the Fair Housing Act since defendants' conduct did not directly affect the availability of housing to minorities." *Id.* at 1130–31. *See also Growth Horizons, Inc. v. Delaware County*, 784 F.Supp. 258 (E.D.Pa. 1992) (noting that refusal by county to assume lease did not directly deny housing to mentally retarded adults and therefore did not violate the FHAA).

In *Devereux Foundation, Inc. v. O'Donnell*, No. 89–6134, 1990 WL 2796, 1990 U.S. Dist. LEXIS 368 (E.D.Pa. Jan. 12, 1990), the district court discussed the reach of § 3604(f)(1). In that case, the plaintiff, a non-profit corporation providing residential and other services to handicapped persons, filed suit against, among others, the O'Donnells, a couple living adjacent to a home intended for use as a group home for five severely retarded adults. That couple had filed a petition for a Writ of Prohibition in Common Pleas court asserting that

the Zoning Board, which had before it the plaintiff's appeal of an adverse zoning ruling, should be precluded from acting on the appeal because it was untimely filed. The plaintiff alleged that the O'Donnells violated the plaintiff's civil rights:

[B]ecause of the O'Donnells' discriminatory attitude towards retarded persons which is based upon prejudice, William and Karen O'Donnell have individually and acting as principals for the law firm of O'Donnell, Hagner and Williams, engaged in a variety of unlawful and unethical actions designed and intended to harass plaintiffs and persons doing business with plaintiffs with the purpose of preventing retarded persons from living next door to them.

*Id.* 1990 WL 2796 at *2, 1990 U.S. Dist. LEXIS at *5.

The O'Donnells brought a motion to dismiss for failure to state a claim upon which relief could be granted. They said that they were not proper parties under the FHAA. Specifically, they claimed that § 3604(f)(1) was intended to reach only those persons who rent, sell, or broker dwellings, as well as governmental agencies enforcing local laws concerning such sale or rental: "There is nothing in the FHAA, however, contend the O'Donnells and the law firm, which permits an action against them merely because they sought to prohibit the Zoning Hearing Board from acting beyond its jurisdiction to hear plaintiff's untimely appeal." *Id.* 1990 WL 2796 at *5, 1990 U.S. Dist. LEXIS at *9.

In response, the plaintiff claimed that the O'Donnells' action was unlawful under the FHAA because they made a dwelling unavailable because of a handicap:

Plaintiff asserts that the "otherwise made unavailable" language in the statute indicates that Congress did not intend the FHAA to apply only to the sale or rental of dwellings; instead, the FHAA was intended to bar any acts which have the effect of preventing handicapped persons from residing in the community.

*Id.*

The court categorically rejected this argument and held that the O'Donnells were

not subject to the proscriptions of the FHAA because their action—filing the petition with the zoning board—was not an integral part of or attendant to the sale or rental of property:

> The principal conduct forbidden by the original Fair Housing Act and accordingly the FHAA, however, is the refusal to sell or rent property to a person because of race, color, religion, sex, national origin or a handicap. The "otherwise make unavailable" language contained in the statute has been applied by the courts to prohibit discriminatory practices attendant to the sale or rental of housing, such as discriminatory rental application procedures or advertising which encourages discrimination. *Even the most expansive interpretations of the Fair Housing Act "do not extend coverage beyond entities that directly provide housing or those that are integrally involved in the sale or financing of real estate."*

*Id.* (citations omitted) (emphasis added) (quoting *Steptoe v. Beverly Area Planning Ass'n,* 674 F.Supp. 1313, 1320 (N.D.Ill.1987)).

The court in *Steptoe v. Beverly Area Planning Ass'n,* 674 F.Supp. 1313 (N.D.Ill. 1987), also examined the scope of § 3604(a).[35] In *Steptoe,* a black homeseeker sued the Beverly Area Planning Association ("BAPA"), a private, not-for-profit corporation under the FHA. BAPA provided housing information only to persons making "nontraditional" moves, *i.e.,* blacks moving to nonintegrated areas or whites moving to integrated areas. Plaintiffs contended that BAPA violated § 3604(a) by engaging in racial steering, thereby making a dwelling unavailable. The court, however, disagreed and held that BAPA did not violate § 3604(a) because it could not have affected the availability of housing:

> This court concludes, as a matter of law, that BAPA's activities could not have affected the availability of housing in a manner implicating section 3604(a). First, BAPA could not have affected adversely the housing opportunities available to either blacks or whites because BAPA did not participate in or influence any commercial transactions: BAPA owns no real estate, is not a real estate agent or broker, is not associated with agents or brokers (entities that dominate the commercial housing market), and is not involved in the actual mechanics of sale or rental transactions.

*Steptoe,* 674 F.Supp. at 1319. Although it noted that § 3604(a) is not limited to sellers of housing or their agents, the court said that that section does not reach wholly tangential entities:

> Cases holding that coverage under the Act is not limited to those who sell, rent, or finance real estate are not inconsistent with this conclusion. Even the most expansive interpretations of section 3604(a) do not extend coverage beyond those entities that directly provide housing or those that are integrally involved in the sale or financing of real estate.

*Id.* at 1320.[36]

This Court agrees with the reasoning and conclusions of the *Devereux* and *Steptoe*

---

**35.** That section makes it unlawful:

> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

Although there are some minor differences between § 3604(f)(1) and § 3604(a), these differences are not relevant to this discussion. Both the HUD regulations and at least one court decision treat § 3604(a) and § 3604(f)(1) as nearly identical. *See* 24 C.F.R. § 100.60(b)(1)–(5) and § 100.70; *Clifton Terrace Assoc. v. United Technologies,* 929 F.2d 714 (D.C.Cir.1991). Therefore, for the purposes of the instant dis-

cussion, the Court will treat the two provisions as analogous.

The major reason for creating a separate provision for handicap discrimination was to ensure that the law not condemn discrimination *on behalf of* handicapped persons. Schwemm § 11.5(3)(a). In other words, reverse discrimination, forbidden under the terms of § 3604(a), is permissible under § 3604(f)(1).

**36.** In a recent decision touching upon the scope of § 3604, *Clifton Terrace Assoc., Ltd. v. United Technologies Corp.,* 929 F.2d 714 (D.C.Cir.1991), the D.C. Circuit held that refusal by an elevator servicing company to repair the elevators in a public housing project inhabited by black residents, many elderly or handicapped, did not

courts.[37] Section 3604(f)(1) covers only those actors who are in a position *directly* to make a dwelling unavailable—that is, a seller, his agent, or another person or entity integrally involved in the sale or financing of real estate. An expansion of the statute beyond this limit would contravene the language of § 3604(f)(1) as well as common sense. Because the Neighbors had no control over the Home, they could not and did not directly deprive Plaintiffs of housing. Therefore, they are not covered by § 3604(f)(1).[38] The Court rejects all § 3604(f)(1) claims against the Neighbors.[39]

### B. *42 U.S.C. § 3604(e)*

▪▪▪▪ Plaintiffs claim that Defendants Scott and Peggy Babin, Hebert, Nosh and Katrina Ivanovic, and Thompson [40] violated § 3604(e) by inducing or attempting to induce, for profit, the sale of the Home to the Ivanovics by representations concerning the entry of handicapped persons into the neighborhood. Section 3604(e) reads:

it shall be unlawful—

> (e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3604(e). Plaintiffs assert that the Babins, Ivanovics, and Hebert "profited" by maintaining their property values. Thompson allegedly tried to induce the sale to secure clients for his legal practice and generate business for his title insurance company.

Congress created § 3604(e) specifically to prevent a process known as "blockbusting," the solicitation by real estate agents of homeowners in a "transitional" neighborhood. The Sixth Circuit described blockbusting as follows:

> It is a well known fact that racial tensions and anxieties are generated when blacks move into previously all-white neighborhoods. *It is also well known that many real estate agencies attempt to exploit such a situation by making repeated, uninvited solicitations for the sale of homes.* In most instances, this activity (commonly referred to as "blockbusting") has proven to be an effective means of stimulating the sale of homes in racially transitional neighborhoods.

*Heights Community Congress v. Hilltop Realty, Inc.*, 774 F.2d 135, 142–43 (6th Cir. 1985), (quoting *Zuch v. Hussey*, 394 F.Supp. 1028, 1049 (E.D.Mich.1975), *aff'd and remanded*, 547 F.2d 1168 (6th Cir. 1977)) (emphasis added), *cert. denied, Hilltop Realty, Inc. v. Cleveland Heights*, 475

---

come within the scope of § 3604. The plaintiff had argued that in failing to repair the elevators, the defendant had effectively made housing units "unavailable" because elevators were needed to access the units. The court responded:

> We agree with the district court that the Fair Housing Act does not cover claims of the type raised by Clifton. Otis [elevator company] does not have a duty under Title VIII to furnish housing services in a nondiscriminatory manner to the tenants of Clifton Terrace. That duty resides primarily with their landlord, Clifton. Clifton cannot so easily convert its statutory duty into a vicarious cause of action against third-party contractors or, as in this case, a would-be contractor.

*Id.* at 719.

**37.** The Court observes that the Neighbors are even more remote from the housing process than was BAPA in the *Steptoe* case.

**38.** The question of whether the Neighbors' activities violated other provisions of the FHAA is addressed *infra*. This section addresses only the scope of § 3604(f)(1).

**39.** Two recent district court decisions, *Casa Marie, Inc. v. Superior Court of Puerto Rico for Dist. of Arecibo*, 752 F.Supp. 1152, 1168–68 (D.Puerto Rico 1990) and *United States v. Scott*, 788 F.Supp. 1555 (D.Kan.1992), held that neighbors who petition a court for relief which has as its effect the denial of housing to a member of a class protected by the FHAA are liable under § 3604(f)(1). Neither of these cases, however, addresses the scope of § 3604(f)(1). Rather, they simply assume that that section applies to neighbors. For the reasons discussed in this section, this Court strongly disagrees with that conclusion.

**40.** Although Thompson is not a neighbor, the Court will address his § 3604(e) claim in this section to avoid redundancy.

U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 318 (1986).

■■■ To establish a § 3604(e) claim, Plaintiffs must demonstrate that Defendants, (1) for profit, used the fear of the entrance of mentally retarded individuals into the neighborhood (2) to induce the sale of a dwelling (3) by making solicitations that would convey to the reasonable person the idea that members of a protected class are, or may be, entering the neighborhood. *Heights*, 774 F.2d at 141–42 (6th Cir.1985) (quoting *Zuch v. Hussey, supra* ).

Plaintiffs' § 3604(e) claims fail because this section was intended by Congress to reach only real estate brokers and their agents. Every case addressing § 3604(e) has involved a real estate agent or a similar entity. *See e.g., Heights, supra; United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115 (5th Cir.), *cert. denied*, 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59 (1973); *Steptoe*, 674 F.Supp. at 1321; *Sanborn v. Wagner*, 354 F.Supp. at 294. Congress clearly signalled this purpose by limiting the scope of § 3604(e) to inducements made "for profit." Although the real estate agent need not actually receive a profit to fall under § 3604(e), *Sanborn*, 354 F.Supp. at 294 (quoting *United States v. Mintzes*, 304 F.Supp. 1305, 1311–12 (D.Md.1969)), the agent must intend to receive financial gain from the inducement of the sale. Schwemm § 17.2 ("The requirement [under § 3604(e) ] that the defendant's representations be "for profit" simply means that they must be made while the salesperson was conducting business"). The Court is aware of no § 3604(e) decision in which the actual or expected profit was other than commission fees or other financial gain normally accruing to real estate brokers.

Congress did not intend to reach beyond real-estate brokers and certainly did not intend that § 3604(e) be used to stifle social or political expression. "They [the words "for profit"] were evidently included in § 3604(e) to distinguish and eliminate from the operation of that subsection statements made in social, political or other contexts, as distinguished from a commercial context, where the person making the representations hopes to obtain some financial gain as a result of the representations." *Sanborn*, 354 F.Supp. at 294. None of the Neighbors was operating in the commercial context. Rather, they were engaging in a social and political protest against the establishment of a group home. That one of several reasons for opposing this home was the fear of reduced property values is insufficient to convert that protest into a commercial transaction similar to that between a home seller and his real estate agent.

Plaintiffs claim that Thompson benefited from the legal representation of individuals in Shelby Township and that he would benefit from the sale of property in that he owned a title company. Other than conclusory allegations, however, Plaintiffs offer no proof that Thompson benefited financially from the sale of the Home to the Ivanovics. In his affidavit, Thompson admits that he provided legal services to some of the persons involved in this lawsuit but adds that he never charged for his services. He further notes that as an owner of a title company it would be in his interest to *encourage* the sale of the Home to the State as this would be more likely to cause home sales in the immediate vicinity to increase. In other words, Thompson actually acted in a manner that resulted in the loss of potential profit.

For these reasons, the Court finds that the Neighbors were not acting "for profit" within the meaning of § 3604(e) and therefore that their protest did not violate § 3604(e).

## C. *42 U.S.C. § 3604(c)*

Section 3604(c) states that it shall be unlawful:

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make

716

any such preference, limitation or discrimination.

42 U.S.C. § 3604(c).

Plaintiffs charge that Peggy Babin, Scott Babin, Thompson, and Maguire [41] violated this section. Peggy and Scott Babin prepared and distributed documents containing negative information about group homes and persons with developmental disabilities. Thompson "published opinions expressing a preference against persons with mental retardation," presumably by speaking against group homes at the town meeting. Maguire represented to Peggy Babin, in private, that a group home would likely result in a decline in property values.

■■■ Section 3604(c) prohibits the dissemination of discriminatory information *"with respect to the sale or rental of a dwelling."* This phrase can be interpreted in two ways. It can be seen as limiting the reach of § 3604(c) only to discriminatory statements made *by the owner or his agent.* Under this interpretation, the phrase "with respect to" is given a narrow meaning and refers to the act of selling or renting a dwelling. However, it could also mean that the speaker need only make the statement about the house that is being sold/rented or that will be sold/rented. This second interpretation imputes a broader meaning to "with respect to."

The Court will adopt the former interpretation. Logically, only the discriminatory comments of a person selling/renting his dwelling, or an agent acting on behalf of that person, would have a direct influence on the disposition of the property. A discriminatory comment by an unrelated person, while offensive, would have little effect on whether the house was sold or rented to a member of a protected class. The purpose of § 3604(c) is to prevent expressions that result in the denial of housing, not to prevent all discriminatory expression.[42] Stated another way, § 3604(c) prevents only potent expressions of discriminatory animus in housing. Congress cannot legislate against the discriminatory comments of those powerless over the housing transaction at issue.[43]

The administrative guideline for § 3604(c) clarifies its limited scope. The guideline says: "The prohibitions in this section shall apply to all written or oral notices or statements *by a person engaged in the sale or rental of a dwelling."* Courts have generally acted consistently with this guideline by limiting the application of § 3604(c) to sellers or their agents. *See Steptoe,* 674 F.Supp. at 1321 n. 13 (if defendant not involved in commercial real estate transactions, his statements cannot violate § 3604(c)); *Woodward v. Bowers,* 630 F.Supp. 1205, 1209 (M.D.Pa.1986) ("The legislative history indicates that by including the phrase 'with respect to the sale or rental of a dwelling', Congress intended to reach the activities of 'property owners, tract developers, real estate brokers, lending institutions, and all others engaged in the sale, rental, or financing of housing' ").[44]

**41.** Although not neighbors, Thompson and Maguire will be discussed in this section.

**42.** Taken to an extreme, the broad interpretation of § 3604(c) urged by the Plaintiffs would make it illegal for a stranger who sees a "For Sale" sign to indicate that he hoped it was not sold to a member of a protected class, as this would be a statement with respect to the sale of a dwelling showing preference based on impermissible characteristics.

**43.** Apart from the impracticality of such legislation, it would face significant First Amendment hurdles. *Stanley v. Georgia,* 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969) ("Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds"). *See also Wainwright v. Allen,* 461 F.Supp. 293, 298 (D.N.D.1978) (noting that a bigoted statement, without a corresponding bigoted act, is insufficient to prove violation of § 1982 and § 3604). The First Amendment aspect of § 3604(c) will be discussed in greater detail *infra.*

**44.** Cf. *Stewart v. Furton,* 774 F.2d 706 (6th Cir. 1985):

As landlords, the Furtons had actual control over the rental of Crosson's trailer. In the specific context of that rental, the Furtons expressed an intention to exercise their control in a discriminatory way. *Their control of the premises together with their statement of intention, coupled with the subsequent race-conscious refusal to rent, is part of one chain of events that renders the Furtons liable for damages under § 3604(c) of the Fair Housing Act.*

*Id.* at 709 (emphasis added).

In *Heights Community Congress v. Hilltop Realty, Inc.*, 629 F.Supp. 1232 (N.D.Ohio 1983), *aff'd in part and rev'd in part*[45], 774 F.2d 135 (6th Cir.1985), *cert. denied*, 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 318 (1986), the district court rejected a § 3604(c) claim against the buyer of a home on the ground that such an expansion would illogically punish a person who can do no harm to the protected buyer:

> Hence, section 3604(c) prohibits only statements by an owner or his agent that pertain to the selling or renting of his dwelling.
>
> The logic of distinguishing between an owner and a buyer of a dwelling is apparent. A prospective buyer of a dwelling is free to state a preference for living with persons of a particular "race, color, religion, sex or national origin." To prohibit such an utterance might deprive that person of his First Amendment right of free expression. *Although his statement may reflect prejudice, the buyer is not able to impose his prejudice "with reference to the sale or rental of [that] dwelling" on others. But when an owner of a dwelling or his agent makes a statement to another person pertaining to the sale or rental of his property based on a "preference, limitation or discrimination based on race ...," he is imposing that "preference based on race" on another person "with reference to the sale or rental of [that] dwelling."*

*Heights*, 629 F.Supp. at 1295 (footnote omitted) (emphasis added).

Therefore, based on precedent and common sense, the Court interprets § 3604(c) to apply only to owners and their agents.[46] As none of the Defendants accused of violating § 3604(c) is an owner or his agent, the § 3604(c) claims will be rejected.

### D. First Amendment

 A review of the record reveals that the Neighbors expressed their opposition to the group home in a number of ways—through letter-writing, a town meeting, contact with the media, and discussions with various people in their personal or official capacities. These modes of expression implicate both free speech and the right to petition the government for a redress of grievances.[47] The Neighbors protested against what they perceived to be an ill-advised decision on the part of the State to sponsor a group home in their neighborhood. The Supreme Court has consistently held that unless protest speech incites imminent lawlessness, it is protected by the First Amendment:

> [T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.

*Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). *See also Whitney v. California*, 274 U.S. 357, 377–79, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927) (J. Brandeis, concurring).

---

**45.** The district court's findings as to § 3604(c) were affirmed by the court of appeals. *Heights*, 774 F.2d at 137.

**46.** Other courts have held that a newspaper, though not an owner of a dwelling, may be liable under this subsection for publishing a discriminatory housing advertisement. *Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc., Div. of Gannett Co.*, 943 F.2d 644, 646 (6th Cir.1991); *United States v. Hunter*, 459 F.2d 205 (4th Cir.), *cert. denied*, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972). In fact, § 3604(c) seems to have been primarily aimed at discriminatory advertisements. *See* 24 C.F.R. § 109.10. However, unlike a discriminatory comment by a stranger to a transaction, a newspaper advertisement transmits the idea or statement of the owner. As such, the newspaper operates as the agent of the owner. *See Steptoe*, 674 F.Supp. at 1321 n. 13 ("Moreover, the newspaper in *Hunter* functioned as a direct conduit of information between buyers and sellers in the commercial market").

**47.** The First Amendment reads:
> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. Amend. I.

The theory behind this "clear and present danger" test is that speech must be protected unless it deprives the listener of the ability rationally to judge the worth of the speech. This is so even if the speech attempts to persuade people to do something that the government considers harmful. *See* David Strauss, *Persuasion, Autonomy, and Freedom of Expression,* 91 Col.L.R. 334, 335–36 (1991). The rationale underlying this theory is that unrestricted expression is crucial in a free society and should not be quelled simply because the government decides that it is undesirable. Rather, before a court may suppress undesirable expression, that expression must be such as would result in imminent violence. Only at this point does the concern for safety supersede the concern for unrestricted expression.

The Court has carefully reviewed the material used by the protesters to express their views. Although sometimes strongly worded and impassioned, it is not inflammatory and could not reasonably be construed as inciting imminent lawlessness. In reference to the April 29, 1989 meeting between Hammonds and some of the Neighbors, Hammonds engaged in the following colloquy with Plaintiffs' attorney:

Q. Okay. What would you say the general tone of the meeting was?

A. I don't recall feeling threatened in any way.

Q. Were any threats made to you at that meeting?

A. No.

Q. Did anybody ask you about your employer?

A. No.

Q. Did anybody—

A. My employer was never brought up.

Q. Did anybody say anything about picketing where you worked?

A. Not as I recall.

\* \* \* \* \* \*

48. Upon receiving the May 6 letter, Town & Country had its attorney write a letter to Peggy and Scott Babin. In that letter, Town & Country's attorney described the communications as "calculated to arise the ire of a normal human being, as well as to threaten, coerce, defame the

Q. When you did read the packet later, what was your reaction?

A. I don't think I was affected by the packet at all.

The Court has also had occasion to review the May 6, 1989 letter to Town & Country signed by a few of the Neighbors. That letter reads:

We want you to be aware of the potential dangers of group homes. Please read the enclosed article "What to do about Billy."

*Florence Hammonds* recently bought a home at *"2323 24 Mile Rd.* and is possibly leasing the home to the State for a group home. We are appalled!

We want you to be concerned.

While this letter exhibits concern and perhaps misguided zeal, it cannot reasonably be termed threatening or intimidating. The only action that the writers request from Town & Country is that it be "concerned." [48]

Another missive from the Neighbors to other persons in the neighborhood gives notice of a meeting and urges the recipients to write to MORC and Town & Country to express their concerns about the group home:

Dangers of Group Homes

*Public Hearing May 12, 1989 at 7:00 PM*

Please Help Keep Our Neighborhood Safe!!!

Please take a few minutes to read the following article and letters [outlining problems associated with group homes]. After reading these you will find a list of people to *write and ASAP telephone* if you are opposed to having a Group Home for Retarded Adults in our neighborhood, now, or in the future. Thank you for your support. We can make a difference.

Again, this communication invites concern and participation but does not incite lawlessness of any sort.

present respected business reputation of our client, Century 21 Town & Country." Contrary to the conclusion of Town & Country's attorney, the Court finds nothing threatening or coercive about the letter.

The other type of protest activity, organizing and appearing at a meeting in the Shelby Township Town Hall, lacked any characteristic which would remove it from First Amendment protection. This meeting gave concerned citizens a chance to express their views on a public issue and to hear the views of MORC representatives. As such, it represents the purest form of protected First Amendment activity.

The courts are rightfully hesitant to prohibit neighborhood protest activities that are neither violent nor intimidating. In *Christian Gospel Church, Inc. v. San Francisco*, 896 F.2d 1221 (9th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 559, 112 L.Ed.2d 565 (1990), a neighborhood association circulated a petition protesting a proposal to permit a church to conduct services in a residential neighborhood. The church charged the association with conspiring to deprive it of its right to the free exercise of religion. The Ninth Circuit rejected this claim holding that the association had a First Amendment right to campaign against the granting of the permit:

> We heard a similar claim in *Evers v. County of Custer*, 745 F.2d 1196 (9th Cir.1984), in which a landowner sued his private neighbors for violation of due process when the neighbors petitioned the government to declare that the road in front of the landowner's house was a public road and could not be fenced off. We held that the action of the neighbors "falls within the first amendment's protection of the right to petition the government for redress of grievances." *Id.* at 1204. *Similarly the Neighborhood Association in this case was fully protected by the first amendment when it campaigned against the granting of the permit.*

*Id.* at 1226 (emphasis added). *See also United States v. Velasquez*, 772 F.2d 1348, 1357 (7th Cir.1985) (noting that a threat to boycott is protected because it expresses a thought or idea), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986); *Wurtz v. Risley*, 719 F.2d 1438, 1442 (9th Cir.1983) (commenting that First Amendment would protect civil rights activist who threatened a segregationist restaurant owner with a boycott); *Collin v. Smith*, 578 F.2d 1197 (7th Cir.) (Village of Skokie could not, consistent with the First Amendment, prohibit Nazi party from marching in front of Village Hall), *cert. denied*, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978).

■ As noted, the First Amendment does not permit unbridled expression. To the extent that a protest campaign is disruptive or interferes with the free use of public property, the state or local government may, of course, limit the time, place, or manner of such protest. In *Resident Advisory Bd. v. Rizzo*, 503 F.Supp. 383 (E.D.Pa.1980), the court found that members of a neighborhood council and others had interfered with the construction of a low income public housing project by threats, physical violence, intimidation, and coercion against those constructing the project. The court enjoined the demonstrators from using loudspeakers, demonstrating on the sidewalks and streets immediately adjacent to the construction site, and using fighting words. In response to the neighbors' contention that this injunction violated their First Amendment rights, the court said:

> Most of the actions enjoined, e.g. harming persons or property and interfering with deliveries, have no First Amendment implications. Concerns relating to freedom of expression arise only in connection with that portion of the injunction which bars picketing and demonstrations in a defined area surrounding the construction site with two exceptions: (1) demonstrations are permitted in a parking lot area adjacent to the site; and (2) one informational picket is permitted to stand beside each of the ten gates in the fence surrounding the site.
>
> It has long been recognized that the First Amendment permits reasonable regulation of the time, place and manner of picketing or other forms of expression in order to further significant governmental interests.

*Id.* at 389. The court balanced the need to permit the construction of the project against the right of the neighbors to dem-

onstrate against the project. *Id.* It limited the form of the protest but did not proscribe the protesters from expressing their anger and disapprobation.

Some forms of speech, of course, may be completely proscribed. In *United States v. Gilbert,* 813 F.2d 1523 (9th Cir.1987), *cert. denied,* 484 U.S. 860, 108 S.Ct. 173, 98 L.Ed.2d 127 (1987), the court held that 42 U.S.C. § 3631 (the criminal companion to § 3617),[49] as applied to a defendant who mailed letters to an adoption agency threatening death to minorities and those who associate with minorities, was not protected by the First Amendment. The court emphasized, however, that implicit in the statute was the requirement of an intent to intimidate: "Nevertheless, the statute's requirement of intent to intimidate serves to insulate the statute from unconstitutional application to protected speech." *Id.* at 1529. The court further noted that "[c]ertain types of expression which by their nature inflict injury or tend to incite an immediate breach of the peace are arguably unprotected." *Id.*

Although this Court does not condone or adopt the views of the speech at issue here, it does not believe it can, without contravening the protections of the First Amendment, permit a suit against the Neighbors under the FHAA on the ground that they engaged in protest activities against the institution of a group home in their neighborhood. Even though their views may be ill-advised, uninformed, and even distasteful, the Neighbors have the right under the First Amendment to engage in these acts without fear of prosecution:

> Yet, a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.

*Cox v. Louisiana,* 379 U.S. 536, 551–53, 85 S.Ct. 453, 463, 13 L.Ed.2d 471 (1965). Very recently, the Supreme Court reaffirmed the notion that even obnoxious and distasteful speech can not constitutionally be proscribed by a statute designed to outlaw "hate" speech. In *R.A.V. v. City of St. Paul,* —— U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), the Court found unconstitutional a St. Paul ordinance which imposed special prohibitions on speakers who express disfavored views on race, color, creed, religion, or gender. This, even where the particular manifestation of speech alleged to have violated the ordinance was cross-burning on the front yard of a black family: "The First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects." *Id.* at ——, 112 S.Ct. at 2547. *See also Texas v. Johnson,* 491 U.S. 397, 412–14, 109 S.Ct. 2533, 2544, 105 L.Ed.2d 342 (1989) (in holding that desecration of American flag was protected speech under the First Amendment, the Court said: "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"); *Doe v. University of Michigan,* 721 F.Supp. 852, 863 (E.D.Mich.1989) (in holding the university's policy on discrimination unconstitutional, the court said: "What the University could not do, however, was establish an anti-discrimination policy which had the effect of prohibiting certain speech because it disagreed with ideas or messages sought to be conveyed").

Plaintiffs respond that First Amendment protections are inapplicable to this case because Defendants' protest incited imminent lawlessness. Plaintiffs add that Defendants were engaged in commercial activity and thus their expression is entitled to a

---

**49.** That statute states, in relevant part:

Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

(a) any person because of his race, color, religion, sex, handicap ... or national origin [because he is exercising his right to housing] shall be fined not more than 1,000, or imprisoned not more than one year, or both.

42 U.S.C. § 3631.

lesser degree of First Amendment protection.[50]

Plaintiffs present absolutely no evidence that Defendants' speech incited imminent lawlessness. They say only that that speech "was intended to incite and encourage violation of the law." Plaintiffs fail to make the crucial distinction between speech that robs the listener of rational thought by demanding immediate action and speech that invokes rational thought. Here, Defendants presented one perspective on group homes. They at no time demanded immediate unlawful action. In fact, much of their protest activity seemed designed to inform the community of the alleged dangers of group homes. They did so by citing newspaper articles and other similar sources. The proper response to this protest, of course, is rebuttal by Plaintiffs showing the lack of danger of group homes.[51]

Plaintiffs also allege that Defendants' protest activities constituted commercial speech and are thus subject to less First Amendment protection than political speech. The basis for this conclusion is that through their "speech," Defendants sought to maintain the value of their property. First, it is clear that the thrust of the Neighbors' concerns, as reflected in the speech at issue, went well beyond their interest in protecting property values. The content of that speech reflects concerns about the safety of their families and other alleged dangers to the security and tranquility of their homes and neighborhood. This component of the speech clearly has no "commercial" content. In fact, it falls directly under the rubric of public issues, a type of speech which "has always rested on the highest rung of the hierarchy of First Amendment values." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980)).

Even that portion of the speech relating to property values does not fall under the rubric of "commercial speech." Although the Supreme Court has failed to provide a concrete definition of commercial speech, it has made clear that commercial speech must have some connection to a commercial *transaction. Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978) ("We have not discarded the 'common sense' distinction

---

**50.** Plaintiffs also argue that Defendants here presented facts instead of opinions and thus lost their First Amendment protection. The Court has not found, and Plaintiffs have not submitted, any case law stating that private persons engaging in valid, nondefamatory protest activities lose their First Amendment protection if they make a false statement of fact. Rather, those cases holding that false statements of fact are not protected are generally libel or defamation suits, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–41, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974), or statements by public officials, *Pickering v. Board of Education*, 391 U.S. 563, 572–74, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968), The Court is unaware of any decision that has held that a private, nonlibellous comment may be denied First Amendment protection simply because it is alleged to be based on fact rather than on opinion. In the instant case, the Court will not apply the rather imprecise distinction between fact and opinion to deny Defendants their right of free speech.

**51.** The activities of the protesters in this case were far less inflammatory than were those of the protester in *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). In that case, the leader of a boycott delivered a speech in which he threatened with violence those blacks who broke the boycott. *Id.* 458 U.S. at 938, 102 S.Ct. at 3439 ("... you better not be caught on these streets shopping in these stores until these demands are met"). In upholding his right to voice these threats under the First Amendment, the Supreme Court said:

An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech. To rule otherwise would ignore the "profound national commitment" that "debate on public issues should be uninhibited, robust, and wide-open."

*Id.* 458 U.S. at 928, 102 S.Ct. at 3434 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)). *See also R.A.V. v. City of St. Paul*, — U.S. —, —, 112 S.Ct. 2538, 2548, 120 L.Ed.2d 305 (1992) (in holding unconstitutional a statute prohibiting cross-burning, the Court said: "The point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content").

between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech"). Further, the Supreme Court has specifically said that "speech does not lose its First Amendment protection.... even though it may involve a solicitation to purchase or otherwise pay or contribute money." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976).

In this case, Defendants sought to maintain their property values by preventing the establishment of a group home. They neither proposed nor effectuated a commercial transaction. Rather, their protest was political and social in nature and simply had, as one of its goals, the prevention of a depreciation in property values. This financial aspect alone does not render the protest commercial speech.

For the above reasons, the Court rejects Plaintiffs' arguments and holds that the Neighbors' protest activities are protected by the First Amendment.[52]

## IV. ACTIVITIES OF THE NEIGHBORS IN (A) PURCHASING THE HOME AND (B) SOLICITING, COLLECTING, AND CONTRIBUTING MONEY FOR THE PURCHASE OF THE HOME

Having offered to purchase the Home for $104,000.00, the Ivanovics apparently needed approximately $5300.00 to consummate the purchase. Scott Babin, who was present at the closing, gave the Ivanovics the needed money. He, Peggy Babin, and Hebert then allegedly solicited money from some Neighbors to refund this expenditure. Hebert and Fortin contributed money. These actions, Plaintiffs assert, violated § 3604(f)(1) and § 3617.[53]

Initially, the Court notes that the solicitation, collection, and contribution of money, unlike the protest activity, are not expressive activities and are therefore not protected by the First Amendment. Thus, there is no constitutional bar to applying § 3604 and § 3617 to these activities. However, as noted, § 3604(f)(1) applies only to Hammonds and Kersten/Town & Country. As the Neighbors were not owners or brokers, or otherwise involved in the real estate market, they are not covered by the proscriptions of § 3604(f)(1). Section 3617, however, is not similarly restricted. The Court must therefore determine whether the solicitation of money violates § 3617.

Section 3617 reads:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

One commentator has delineated three different types of situations in which coercion, threats, or interference would be unlawful under this section:

(1) in the exercise or enjoyment of any right protected by §§ 3603–3606;

(2) on account of that person having exercised or enjoyed such a right; and

(3) on account of a person's having aided or encouraged someone else in the exercise or enjoyment of such a right.

Schwemm § 20.2.

There is no dispute that at least some of the Neighbors solicited money for the purpose of facilitating the purchase of the

---

**52.** Having found these activities protected, there is no need to examine whether they are violative of § 3617. However, the Court does note that it does not consider the protest activities to be "interference" as defined under § 3617, and therefore would not find the Neighbors liable under that section. *See infra.*

**53.** Plaintiffs also appear to assert that the solicitation of money by Scott and Peggy Babin violated § 3604(e). For the same reasons that the Court dismissed the § 3604(e) claims in the context of the protest activities—*i.e.*, they were not "for profit" activities as required by that section—it similarly dismisses those claims in the context of the solicitation of money.

Home by the Ivanovics.[54] There is likewise no dispute that these persons facilitated the purchase of the Home by the Ivanovics because they did not wish the Home to be used as a group home. The remaining issue is whether the collection of the money constitutes "interference" under § 3617.

As an initial matter, the Court observes that the courts are in disagreement as to the requirement of a nexus between a § 3617 claim and a § 3604 claim. As the Court has denied Plaintiffs' § 3604 and § 3605 claims against Hammonds, the determination of this issue could be dispositive of the § 3617 claims.

The Seventh Circuit has said that when the violation of § 3617 involves the same conduct and the same party responsible for a violation of § 3604, and the court finds the underlying § 3604 claim meritless, then the court must also find the § 3617 meritless. *Metropolitan Housing Dev. Corp. v. Arlington Heights,* 558 F.2d 1283, 1288 n. 5 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978). *See also South–Suburban Housing Center v. Greater South Suburban Bd. of Realtors,* 935 F.2d 868, 886 (7th Cir.1991), *cert. denied, Greater South Suburban Bd. of Realtors v. Blue Island,* — U.S. —, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992) (noting that if same conduct, § 3617 claim is dependent on § 3604 claim).

However, the more persuasive view is that a § 3617 claim may proceed even when there is no § 3604 violation. By its plain language, § 3617 is applicable when an individual has been deprived of the "exercise and enjoyment of any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." There is no indication that a protected right must have been denied, only that its exercise or enjoyment must have been impaired. This suggests that the coercion or intimidation must be *in the context of* the exercise of a right guar-

anteed by the FHAA, but not necessarily as a consequence of a violation of such right. In other words, a plaintiff may bring an action under § 3617 when he has been prevented from asserting his rights under the FHAA, or when he has been granted all the rights due under the FHAA but the defendant has retaliated or coerced that defendant, or others, in connection with the successful assertion of these rights. *See, e.g., Stackhouse v. DeSitter,* 620 F.Supp. 208, 211 (N.D.Ill.1985); *Smith v. Stechel,* 510 F.2d 1162 (9th Cir.1975).

In sum, the Court holds that a successful claim under § 3604 is not a prerequisite to the bringing of a claim under § 3617. As such, the Court will proceed to consider Plaintiffs' § 3617 claim against the Defendants.

A review of the case law concerning the scope of § 3617 reveals that in cases in which a private party (as opposed to public entities [55]) is accused of violating § 3617, the conduct at issue is usually violence or intimidation directed at a protected person or retaliatory action against someone attempting to aid a protected person. In *Sofarelli v. Pinellas County,* 931 F.2d 718 (11th Cir.1991), the court found coercion when individuals tried to block the plaintiff's movement of a house by trailer into a neighborhood; apparently, it was rumored that the plaintiff intended to sell the house to a member of a protected group:

We find that Sofarelli may be able to prove a set of facts which would establish violations of the Fair Housing Act. Sofarelli alleges that members of Hibing's community committed certain actions—such as leaving a note threatening "to break [Sofarelli] in half" if he did not get out of the neighborhood and running up to one of Sofarelli's trucks, hitting it, shouting obscenities and spitting at Sofarelli—which would clearly constitute coercion and intimidation under § 3617.

---

**54.** Fortin claims that he contributed the money on the assumption that he was repaying Hebert for legal fees and that he did not know that the $500.00 he contributed went to reimburse Scott Babin.

**55.** Exclusionary zoning policies have been attacked under § 3617 as well as under § 3604.

*See e.g., United States v. Birmingham,* 727 F.2d 560, 561 (6th Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *United States v. Black Jack,* 508 F.2d 1179, 1188 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975).

*Id.* at 722. *See also Evans v. Tubbe,* 657 F.2d 661, 662 (5th Cir.1981) (white property owner threatened, intimidated, and harassed neighboring black property owner); *Stirgus v. Benoit,* 720 F.Supp. 119, 123 (N.D.Ill.1989) (racially-motivated firebombing); *Seaphus v. Lilly,* 691 F.Supp. 127, 138–39 (N.D.Ill.1988) (racially-motivated violence and property damage); *Stackhouse, supra* (racially-motivated firebombing).

Courts have also found that retaliation by an employer against his employee is actionable under § 3617. Retaliation by an employer is, in essence, a nonviolent form of coercion which violates § 3617 because the employer is using his superior power to prevent his employee from fulfilling the mandate of the FHAA. In *Meadows v. Edgewood Management Corp.,* 432 F.Supp. 334 (W.D.Va.1977), the court said that employers who had fired the plaintiff-employees for encouraging tenants to assert their fair housing rights were liable under § 3617. The defendant employers had not engaged in blatant violence or intimidation, but had used their hiring/firing power in an attempt to coerce their employees to behave in a discriminatory manner. *See Smith, supra* (apartment manager fired for renting to protected persons); *Wilkey v. Pyramid Const. Co.,* 619 F.Supp. 1453, 1454–55 (D.Conn.1985) (secretary fired for aiding protected persons obtain housing).

One decision has stressed the limits on the scope of § 3617. In *Clifton Terrace Assoc. v. United Technologies,* 728 F.Supp. 24 (D.D.C.1990), *aff'd in relevant part and vacated in part,* 929 F.2d 714 (D.C.Cir. 1991), the owner of a public housing building claimed that the elevator servicing company violated § 3617 by refusing to repair the elevators in his building. The owner alleged that he aided tenants in enjoying their fair housing rights and the elevator company interfered with this effort by refusing to repair the elevators. The court responded: "As the caselaw relied upon by plaintiff demonstrates, the intimidation or

coercion with the exercise of fair housing rights contemplated by § 3617 is far more direct, intentional, and indeed different in kind from that alleged herein." *Id.* at 30.

These cases indicate that to state a cause of action under § 3617, a plaintiff must demonstrate either the use or threatened use of some type of force or duress—physical, economic, emotional—for the purpose of denying the plaintiff his housing rights. There is no indication in the case law that "interference" has been interpreted in the broad sense in which Plaintiffs attempt to apply it, namely, as the performance of any act that has the effect of hindering the ability of a member of a protected class from obtaining housing.

The Court does not believe that Congress could have intended "interfere" to be applied in its broadest sense.[56] The word "interfere" has a very broad meaning, signifying both hindrance and trespass. *Black's Law Dictionary* defines it to mean "[t]o enter into, or to take part in, the concerns of others." *Black's Law Dictionary* 417 (5th ed. 1983).[57] If an individual could be found liable under § 3617 for hindering any protected person's enjoyment of rights guaranteed under §§ 3603–3606, then a whole range of otherwise innocuous acts would fall under § 3617. For example, a competing bidder could be seen as interfering with a plaintiff's right to enjoy housing. Similarly, a letter to the local government protesting an alleged zoning violation could be cognizable under § 3617. Even dilatory repair or construction work such as that alleged in *Clifton Terrace, supra,* could be actionable.

■ The Court believes that Congress intended "interfere" to have a more direct, restricted meaning in this context, namely, the use or threat of force, coercion, or duress to hinder valid housing rights. This interpretation is supported by the doctrine of *ejusdem generis* which says that "when a general term follows a specific one, the

---

**56.** Again, as discussed *supra,* were the Court to interpret § 3617 as broadly as Plaintiffs urge, this provision too would face serious First Amendment obstacles.

**57.** *Black's* also defines "interfere" as: "To check; hamper; hinder; infringe; encroach; trespass; disturb; intervene; intermeddle; interpose." *Black's Law Dictionary* 417 (5th ed. 1983).

general term should be understood as a reference to subjects akin to the one with specific enumeration." *Norfolk & W.R. Co. v. American Train Dispatchers, Ass'n,* —— U.S. ——, ——, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991); *Owen of Georgia, Inc. v. Shelby County,* 648 F.2d 1084, 1092 (6th Cir.1981).[58] Thus, the specific terms identify the class, and the general term is limited to things within that class. In the instant case, the statute reads: "It shall be unlawful to *coerce, intimidate, threaten, or interfere* with any person ..." (emphasis added). The word "interfere" is clearly more general than the three preceding terms, all of which describe a more specific form of interference. Therefore, "interfere" is restricted to the class of actions enumerated by the three preceding terms. These terms, "coerce[59]," "intimidate[60]," and "threaten[61]," all suggest interference through compulsion. Therefore, the class of actions prohibited by § 3617 is limited to those types of activities or conduct in which a defendant uses, or threatens the use of, some type of force to deny a plaintiff his right to housing.

Some courts have taken a different view of § 3617, claiming that it encompasses any type of interference with a housing right directed against a protected class. In *United States v. American Institute of Real Estate Appraisers, Etc.,* 442 F.Supp. 1072 (N.D.Ill.1977), *appeal dismissed,* 590 F.2d 242 (7th Cir.1978), the court found a

real estate appraiser covered by § 3617. As justification for its application of § 3617 to appraisers, the court, after finding that § 3604(a), broadly construed, applies to appraisers, said only the following:

> The "or interferes with" language of section 817 [3617] has been similarly broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the Act. The Act requires a liberal construction if the statute is to prohibit effectively "all forms of discrimination, sophisticated as well as simple-minded...."

*Id.* at 1079 (citations omitted).

Similarly, in a case extending the reach of § 3617 to insurance redlining, the court said only the following:

> In the present case, plaintiffs allege that they were denied a loan because of the racial composition of the neighborhood in which the home was located. We agree that this alleged conduct "interfere[s] with [the plaintiffs] in their exercise of or on account of [their] having exercised or enjoyed" the right to equal housing opportunity protected by the Fair Housing Act, causing plaintiffs the "loss of important benefits from interracial association."

*Laufman v. Oakley Bldg. & Loan Co.,* 408 F.Supp. 489, 498 (S.D.Ohio 1976) (citation omitted).[62]

---

**58.** One commentator describes the theory behind *ejusdem generis* as follows:

> If the general words are given their full and natural meaning, they would include the objects designated by the specific words, making the latter superfluous. If, on the other hand, the series of specific words is given its full and natural meaning, the general words are partially redundant. The rule "accomplishes the purpose of giving effect to both the particular and the general words, by treating the particular words as indicating the class, and the general words as extending the provisions of the statute to everything embraced in that class, though not specifically named by the particular words."

Norman J. Singer, *Sutherland Statutory Construction* § 47.17 (5th ed.) (1992) (footnotes omitted).

**59.** "Coerce. Compelled to compliance; constrained to obedience, or submission in a vigor-

ous or forcible manner." *Black's Law Dictionary* 135 (5th ed. 1983).

**60.** "Intimidation. Unlawful coercion; extortion; duress; putting in fear." *Black's Law Dictionary* 423 (5th ed. 1983).

**61.** "Threat. A declaration of one's purpose or intention to work injury to the person, property, or rights of another, with a view of restraining such person's freedom of action." *Black's Law Dictionary* 769 (5th ed. 1983).

**62.** Other courts have expanded the scope of § 3617 to include an attempt by neighbors to enforce a court order or a restrictive covenant. *Casa Marie, Inc. v. Superior Court of Puerto Rico for Dist. of Arecibo,* 752 F.Supp. 1152, 1168–69 (D.Puerto Rico 1990) (enjoining neighbors from enforcing state court order closing group home based, in part, on § 3617); *United States v. Scott,* 788 F.Supp. 1555 (D.Kan.1992) (initiating

These decisions are problematic in that they conclude that § 3617 should be applied very broadly but fail satisfactorily to support this conclusion. They simply refer to the broad remedial goals of the FHA and state in a conclusory fashion that the activity or conduct in question interferes with housing rights. In fact, the decisions that applied § 3617 to appraisers and lending institutions first found a § 3604 violation and then simply assumed the existence of a § 3617 violation. *American Institute of Real Estate Appraisers*, 442 F.Supp. at 1079; *Laufman*, 408 F.Supp. at 498. In other words, they assumed that a § 3604 violation was necessarily a § 3617 violation. Under this theory, making a dwelling "unavailable" automatically, regardless of the reason, constitutes interference under § 3617.

In addition, the Court notes an important distinction between the interference activities found in the above cases and those alleged here. In the *American Institute of Real Estate Appraisers* and *Laufman* cases, the alleged interferers, through their impact on housing valuation (appraisers) and insurability, possessed the ability to implement a wholesale scheme of invidious discrimination by affecting the activity of protected homeowners to gain access to the housing market. In contrast, here the alleged interfering activities of the neighbors was purely private and focused only on one local home. The Neighbors' activities here did not have sufficient force or impact to control the housing market.

This Court believes that a more realistic, workable analytic framework would focus on the type of behavior or conduct which Congress appears to have attempted to proscribe under § 3617. With this in mind, a court may then proceed accurately to interpret the meaning of the statutory language.

To constitute a violation of § 3617, the act in question must contain an element of force or direct intimidation, or immediate threats thereof. The interference contemplated by the statute must be in conjunction with this type of coercive or threatening activity, and the interferer must possess the actual ability through these acts to preclude the availability of housing.

Obviously, application of this standard requires a case-by-case analysis. As in many legal contexts, there is a spectrum of activity to which a statute could conceivably be applied. Here, for example, the spectrum would range from the most egregious violations, which may clearly be proscribed and encompassed within the intent of the statute, such as firebombing, physical intimidation, cross burning, etc., to the more problematic activities such as petitioning, letter writing, and the organizing of peaceful neighborhood protests. The question is not whether the motivation and object of these activities are ill-informed, distasteful, or even abhorrent. The question is whether the more benign and indirect manifestations of these motivations were intended to be proscribed and whether they can constitutionally be proscribed.

This Court holds that Congress did not intend to reach, nor could it constitutionally reach, those activities at the "expression" end of the spectrum. Activities such as those alleged here simply do not possess the coercive immediacy necessary to violate the statute. A plaintiff does not state a claim under that section by simply asserting that a defendant "interfered" with his housing rights without also alleging some component of potent force or duress.[63]

---

lawsuit against persons selling home to protected person violated § 3617). The Court observes that the decisions in *Casa Marie* and *Scott* raise First Amendment concerns in that they punish the defendants for making use of the judicial system. *See City of Columbia v. Omni Outdoor Advertising, Inc.,* —— U.S. ——, ——, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991) (noting that resort to judicial processes is protected regardless of motive so long as the claimant genuinely intends to procure favorable government action).

**63.** Section 100.400 of the Code of Federal Regulations lists five nonexclusive examples of actions prohibited by § 3617. Of these five examples, only one (the second) even mentions interference as a prohibited activity. Of the five examples, this second example is the broadest and most general; in fact, it essentially paraphrases the language of the statute.

The other four examples are more specific and, in the opinion of the Court, better capture the type of activity that Congress intended to

Using these standards, the Court will analyze the specific conduct alleged here. The precise nature of the § 3617 claim against Hammonds is unclear. Apparently, Plaintiffs simply allege that Hammonds interfered with the housing rights of Plaintiffs. However, Hammonds clearly did not use force or the threat of force at any time in connection with the sale of the Home to the Ivanovics. Therefore, she is not liable under § 3617.

The Neighbors' solicitation and collection of money likewise did not involve force or the threatened use of force or coercion. The Neighbors contributed money to the Ivanovics who then used this money to consummate a voluntary housing transaction with Hammonds. Of course, the solicitation and contribution of this money had the ultimate effect of preventing Plaintiffs from leasing the Home. In the broadest sense of the word, then, the contribution of money did "interfere" with Plaintiffs use

of the Home. However, under this broad interpretation of "interfere," Plaintiffs also would have an action against MORC and the State in that, as explained above, it was MORC's failure to act on the offer to rent which had the *direct* effect of making the Home unavailable to Plaintiffs. Because the Court does not adopt this overbroad definition of "interfere," it finds neither the Neighbors nor MORC liable under § 3617.[64]

## V. CONSTITUTIONALITY OF FHAA

Although none of the parties raised the issue, the Court became concerned that the constitutional basis for Congress's authority to prohibit housing discrimination on facts such as those presented here was unclear. Particularly troubling was the notion that Congress could, under the Commerce Clause, regulate the sale of the Home by one private party to another private party simply because Plaintiffs allege

---

prohibit by § 3617. The first example refers to attempts to coerce a person, orally or in writing, on the basis of his protected status, so as to deny to that person benefits connected with the sale or lease of a dwelling. The third example refers to efforts to threaten an employee with dismissal or an adverse employment action because that employee attempted to assist a protected person in seeking access to a dwelling. The fourth example refers to "[i]ntimidating or threatening" any person because that person is attempting to make other persons aware of their housing rights. The final example speaks of "[r]etaliating" against any person who has made a complaint or otherwise participated in a proceeding under the FHA.

The activity targeted in these four examples is precisely the type of activity that this Court believes is covered under § 3617, that is, threats, coercion, intimidation, and retaliation in connection with the attempt to secure for oneself or for another the benefits guaranteed by the FHA or FHAA. *See* 24 CFR Ch. 1, Subpt. F, § 100.400(c)(1)–(5) (1991).

**64.** In *Sutton v. Bloom,* 710 F.2d 1188 (6th Cir. 1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984), the defendant collected money from neighbors so as to put a down payment on a house as to which the Suttons, a black couple, had already signed a purchase agreement. The Suttons sued Bloom under the Civil Rights Act. The specific issue addressed by the Sixth Circuit was the appropriate limitation period. As §§ 1981/1982 do not have a statute of limitations, the court looked to the most analogous Ohio statute. It held that the

most analogous Ohio law was Ohio's fair housing law which reads, in relevant part:

It shall be unlawful discriminatory practice: For any person to:

\* \* \* \* \* \*

(12) Coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of that person's having exercised or enjoyed ... any right guaranteed by division (H) of this section [guaranteeing housing rights].

*Id.* at 1190. In commenting on the nexus between the facts of the case and the Ohio statute, the Sixth Circuit said:

Unlike the plaintiff in *Warner v. Perrino,* 585 F.2d 171 (6th Cir.1978), the Suttons have included a claim under § 1981 for violation of their contract rights but the *essence* of their claim is racial discrimination in housing. As in *Warner,* this "falls squarely within the purpose and reach of Ohio's fair housing laws," particularly the proscription in § 4112.-02(H)(12) against third-party interference because of race with the right to purchase housing.

*Id.* at 1191.

At no point in *Sutton* does the Sixth Circuit engage in a substantive analysis of either the Civil Rights Act or the Ohio statute (the FHA was not at issue in the case). The court was simply engaging in a necessary procedural analysis of a state statute to determine whether its limitation period would apply. Thus, as the Sixth Circuit does not state, or even imply, that "interfere," as used in the Ohio law, would apply to the facts of *Sutton,* that case has absolutely no precedential value in the instant case.

that the Neighbors who contributed approximately $5000.00 toward that sale acted with discriminatory intent toward the handicapped. The Court believes it necessary to examine the constitutional basis for the application of the Commerce Clause power to the facts of this case.

Although it is well settled that Congress may prohibit housing discrimination based on race pursuant to the Thirteenth Amendment[65], and that, under the Fourteenth Amendment, Congress may prohibit housing discrimination involving "state action," it is decidedly less clear whether Congress may, under the Constitution, prohibit nonracial housing discrimination by individuals acting in their purely private and personal capacity.

This Court wholly embraces the well-established principle that a court should not decide a question on constitutional grounds unless such adjudication is unavoidable. *New York City Transit Authority v. Beazer*, 440 U.S. 568, 581–83, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979). However, the facts of the instant case bring sharply into question the underlying constitutional authority of Congress to enact the FHAA and, as such, the constitutionality of the FHAA as applied to the facts of this case must be addressed. For this reason, the

Court, by Order, asked the parties to brief this issue, and permitted the United States Department of Justice to file an *amicus curiae* brief.

Before beginning its constitutional analysis, the Court notes that its concern over the constitutional dimensions of the FHAA was initially triggered by what was clearly an element of congressional concern and recognition within the statute that the constitutional boundaries of the FHAA might well not be unlimited. The FHA begins with the following declaration of policy: "It is the policy of the United States to provide, *within constitutional limitations,* for fair housing throughout the United States." 42 U.S.C. § 3601 (emphasis added). The Court interprets this clause as an invitation to the judiciary to ensure that the Act, as applied, conforms to the Constitution. Thus, in examining the constitutional basis for the FHAA, the Court is attempting to effectuate the intent of Congress to limit the Act to its constitutionally permissible applications.

 The Constitution reserves to Congress certain powers enumerated in Article I, Section 8. This "checklist" begins, "The Congress shall have the Power To ...," and then sets forth eighteen clauses of discrete powers allocated to Congress.[66]

---

**65.** The Thirteenth Amendment reads:

Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2. Congress shall have power to enforce this article by appropriate legislation. U.S. Const. amend. XIII.

**66.** Article I, Section 8 reads:

Section 8. The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

To borrow Money on the credit of the United States;

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States;

To coin Money, regulate the Value thereof, and of foreign Coin, and fix the Standard of Weights and Measures;

To provide for the Punishment of counterfeiting the Securities and current Coin of the United States;

To establish Post Offices and post Roads;

To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;

To constitute Tribunals inferior to the supreme Court;

To define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations;

To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;

To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

To provide and maintain a Navy;

To make Rules for the Government and Regulation of the land and naval Forces;

This affirmative grant of power has a negative corollary: those powers not listed in Article I, Section 8 do not belong to Congress. Had the drafters of the Constitution not intended Congress's powers to be limited, a discrete enumeration of powers would have been unnecessary. *See* Redish & Drizin, *Constitutional Federalism and Judicial Review: The Role of Textual Analysis*, 62 N.Y.U.L.Rev. 1, 13–14 (1987) ("Redish"). The idea that the federal government was to exercise authority over only limited spheres of the lives of Americans was eloquently set forth by James Madison:

> The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite. The former will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce; with which last power of taxation will, for the most part, be connected. The powers reserved to the several states will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State.

*The Federalist No. 45*, at 292 (James Madison) (Clinton Rossiter, ed., 1961).

Because the concept of enumerated powers is part of the fabric of the Constitution, the Tenth Amendment is arguably redundant. It says, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." In effect, the Tenth Amendment serves only to emphasize the restricted nature of Congress's authority. According to one commentator, however, the Tenth Amendment, at the time of its adoption, also served the important political purpose of allaying the fears of state representatives who wished to ensure the continuing autonomy of their states under the federalist schema. Redish at 11. In any event, Article I, Section 8 and the Tenth Amendment together leave no doubt that the Constitution envisions a federal government whose powers are limited to discrete areas apart from which the states and their citizens are to enjoy freedom from federal oversight and regulation.

■ It has been the traditional role of the judiciary to ensure that the constitutional schema established by the drafters is honored.[67] When Congress first enacted the FHA in 1968, some believed that its authority to do so lay in the Fourteenth Amendment and the Commerce Clause. *See generally Fair Housing Act of 1967:*

---

> To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;
> To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;
> To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards and other needful Buildings;—And
> To make all Laws which shall be necessary and proper for carrying into Execution the

> foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

U.S. Const. art. I, § 8.

**67.** As noted by Alexander Hamilton, "The interpretation of law is the proper and peculiar province of the courts. A constitution is, in fact, and must be regarded by judges, as fundamental law. It therefore belongs to them to ascertain its meaning...." *The Federalist No. 78* at 467 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Along with the power to interpret the Constitution comes the concomitant power to strike down unconstitutional governmental action. This judicial review process was established as a duty of the judiciary soon after the establishment of the constitutional system. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 176–80, 2 L.Ed. 60 (1803). The power of judicial review has been used by the courts to ensure that Congress exercise only those powers assigned it by the Constitution. *Id.*

*Hearing on S. 1358, S. 2114, and S. 2280 Before the Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking and Currency*, 90th Cong., 1st Sess. 6–14, 23–24 (1967) ("Senate Hearings"). However, soon after enactment of the FHA, the Supreme Court held in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) that racial discrimination in housing falls under the rubric of "badges and incidents of slavery" and that Congress therefore has the power to regulate it under the Thirteenth Amendment. *Id.* 392 U.S. at 438–41, 88 S.Ct. at 2203–04. Since then, the courts have relied almost exclusively on the Thirteenth Amendment to uphold the constitutionality of the FHA. *See e.g., United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 120–21 (5th Cir.), *cert. denied,* 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59 (1973); *United States v. Hunter*, 459 F.2d 205, 214–25 (4th Cir.), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972); *United States v. Parma*, 661 F.2d 562, 573 (6th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982). However, the FHAA addresses discrimination against the handicapped and, therefore, cannot have its constitutional foundation in the Thirteenth Amendment. Therefore, with respect to the FHAA, the Court must look to either the Fourteenth Amendment or the Commerce Clause to determine the extent of Congress's authority under the Constitution to promulgate a statute that could be applied to the facts presented in the instant case.

### A. *Fourteenth Amendment*

■ Plaintiffs contend that Congress has the authority under the Fourteenth Amendment to enact housing legislation under the FHAA directed at private per-

sons (as opposed to a state actor or entity).[68]

The Fourteenth Amendment provides, in relevant part:

Section 1. . . . *No state shall make or enforce any law* which shall abridge the privileges or immunities of citizens of the United States; nor shall nay State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

\* \* \* \* \* \*

Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

(Emphasis added.)

It is undisputed that there was no state action involved in the solicitation and collection of money by the Neighbors, nor in any of the other activities in which they engaged. In fact, none of the claims asserted against Defendants, with the possible exception of the claims against Maguire and Shelby Township [69], implicates state action. Therefore, the Fourteenth Amendment can justify prohibition of housing discrimination by Defendants only if Congress can regulate the behavior of private persons under that amendment.

The Supreme Court has consistently held that the Fourteenth Amendment covers only state action. Although it has set forth varying means by which an action can be considered state action, it has not yet relinquished the requirement that the act must have some nexus to a state governmental function to be within the ambit of the Fourteenth Amendment. In *United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966) the Court said: " 'The Fourteenth Amendment protects the individual against *state action*, not against wrongs done by *individuals.*' This has

---

**68.** The Government, in its *amicus* brief, appears to admit that the constitutionality of the FHAA is not established by the Fourteenth Amendment. It says:

Because neither the Thirteenth nor Fourteenth Amendments would appear to provide a basis for prohibiting this kind of discrimination *[handicap discrimination]*, attention has been

directed back to Congress's understanding of the constitutional basis for the original Act, as shown in its legislative history.

Government Brief at 4 (emphasis added).

**69.** Shelby Township and Maguire are accused of violating § 3617 by permitting Peggy Babin to schedule a meeting in the Shelby Township Hall. The Court disposed of this claim above.

been the view of the Court from the beginning. It remains the Court's view today." *Id.*, 383 U.S. at 755, 86 S.Ct. at 1176 (citations omitted) (emphasis in original). *See also United Brotherhood of Carpenters & Joiners, Local 610 v. Scott,* 463 U.S. 825, 830, 103 S.Ct. 3352, 3357–58, 77 L.Ed.2d 1049 (1983) (noting that plaintiff must show some state involvement to state a claim under Fourteenth Amendment).

Plaintiffs respond that six Supreme Court justices in *Guest,* three in a concurring opinion and three in a concurring/dissenting opinion, said that they thought that § 5 of the Fourteenth Amendment authorized Congress to regulate private conspiracies. On this basis, Plaintiffs ask the Court to ignore the clear language of the majority opinion in favor of a "head-counting" approach. This Court is not privy to the inner workings of the Supreme Court. Thus, it is unaware how that Court reached its decision in *Guest.* It can only rely on the majority opinion, not on contradictory concurring and dissenting opinions. Moreover, the Court observes that an opinion by eight justices issued the same day as *Guest* said the following: "As we have consistently held 'The Fourteenth Amendment protects the individual against *state action,* not against wrongs done by *individuals.*'" *United States v. Price,* 383 U.S. 787, 799, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966) (quoting *United States v. Williams,* 341 U.S. 70, 92, 71 S.Ct. 581, 593, 95 L.Ed. 758 (1951)) (emphasis in original). In a recent decision, the Court said: "Racial discrimination, though invidious in all contexts, violates the Constitution only when it may be attributed to state action." *Edmonson v. Leesville Concrete Co., Inc.,* — U.S. —, —, 111 S.Ct. 2077, 2082, 114 L.Ed.2d 660

(1991). *See also National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 461, 102 L.Ed.2d 469 (1988) ("[a]s a general matter the protections of the Fourteenth Amendment do not extend to 'private conduct abridging individual rights'") (quoting *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961)).

The Court thus relies on the majority holdings in, among others, *Guest, Price,* and *Tarkanian* which unambiguously refuse to expand the Fourteenth Amendment to reach private action. It will not apply the Fourteenth Amendment to validate the application of the FHAA to the facts of the instant case. If Congress possesses the authority to enact the FHAA and have it applied to the facts of the instant case, that authority must be found within the Commerce Clause.

### B. Commerce Clause

### 1. Introduction and standard of review of a Commerce Clause challenge

■ The Commerce Clause is a grant of authority to Congress. Using this authority, Congress may enact laws. A law enacted pursuant to the Commerce Clause may validly be applied to the extent that that law reaches activity that is within Congress's authority under the Commerce Clause. However, a law loses its validity if applied in such a way as to extend its reach beyond the original grant of authority under the Commerce Clause. In the following discussion, the Court will attempt to determine the validity of the application of the Commerce Clause authority, through the FHAA, to the facts of this case.[70]

**70.** Normally, a court will review a statute under the Commerce Clause (or other constitutional grant of authority) by examining the constitutionality of the statute as a whole. That is, it will ask whether or not the *class of activities* covered by the statute is within the authority conferred to Congress by the Commerce Clause. *See e.g., Perez v. United States,* 402 U.S. 146, 154, 91 S.Ct. 1357, 1361, 28 L.Ed.2d 686 (1971). It may not "excise as trivial, individual instances" of the class. *Id.*

However, certain statutes contain language which requires that a court engage in a case-by-

case constitutional analysis. This language seems to appear in broadly worded statutes and may be intended to serve as a guarantee that the statute will pass muster under the Constitution. In other words, although a far-reaching statute might be seen as being outside the scope of Congress's power under, for example, the Commerce Clause, the addition of language limiting the application of the statute to those instances implicating interstate commerce can ensure that the entire statute will not be invalidated. Thus, if a court is able to proscribe a statute's application to one particular fact situation, it need not

732

■ The original purpose of the Commerce Clause was, it seems, to enable the federal government to control national commerce, thereby preventing the states from engaging in destructive tariff disputes. In commenting on the existing confederacy before the ratification of the Constitution, Madison decried the inefficiency of a system of commerce in which one state could tax another state for goods passing through the former:

> A very material object of this power [to regulate commerce] was the relief of the States which import and export through other States, from the improper contributions levied on them by the latter. Were these at liberty to regulate the trade between State and State, it must be foreseen that ways would be found out, to load the articles of import and export, during the passage through their jurisdiction, with duties which would fall on the makers of the latter, and the consumers of the former.

*The Federalist No. 42.* He particularly noted that such inefficiency would jeopardize the trading position of America with foreign nations and especially Britain.[71] Thus, one of the major purposes of the Commerce Clause was to remedy this situation by appointing the federal government as superintendent of commercial traffic crossing state lines. It reads:

> The Congress shall have the power ...
>
> * * * * * *
>
> To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.

Article I, Section 8, Clause 3.

■ Under the purpose and language of the Commerce Clause, Congress has the power to regulate commerce among the states. To be susceptible of congressional power, however, the activity to be regulated must satisfy two distinct criteria: (1) it must be "commerce" and (2) it must be "among the several states." Without attempting to define these terms precisely,

condemn the statute as a whole. In such instances, when a court examines whether a particular fact situation falls within the ambit of a particular statute, it is also necessarily verifying that that fact situation falls within the ambit of the constitutional grant of power.

For example, the Sherman Anti–Trust Act, 15 U.S.C. § 1, discussed *infra,* reads, in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, *in restraint of trade or commerce among the several States,* or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (emphasis added). Therefore, under the explicit language of the Sherman Act, a contract is only illegal if it restrains commerce among states or nations. As this is precisely the standard for a Commerce Clause analysis, a court determining whether the Sherman Act applies to a given fact situation is also necessarily determining whether the Commerce Clause applies to that fact situation. *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 239–41, 100 S.Ct. 502, 508, 62 L.Ed.2d 441 (1980). *See also* Labor Management Relations Act, 29 U.S.C. § 141(b) ("It is the purpose and policy of this chapter ... to prescribe the legitimate rights of both employees and employers *in their relations affecting commerce....*") (emphasis added).

In the instant case, the relevant language of the FHAA (and the FHA) provides: "It is the policy of the United States to provide, *within constitutional limitations,* for fair housing throughout the United States." 42 U.S.C. § 3601. Under this language, the application of

the FHAA to a particular fact situation is permissible only if that application does not contravene any relevant constitutional limitations. Thus, as with the limiting language of the Sherman Act and LMRA, through this language Congress has urged courts to engage in a constitutional analysis each time they apply the FHAA to a particular fact situation. Therefore, in the following analysis, the Court will attempt to determine whether the FHAA may be applied *within constitutional limitations* to the instant fact situation.

**71.** Apparently, after the war, the British exploited the lack of unanimity among the states on the question of trade to secure commercial advantages. As recorded by a contemporary observer:

> The conduct of Great–Britain in declining any commercial treaty with America, at that time, was unquestionably dictated at first by a knowledge of the inability of congress to extort terms of reciprocity from her; and of that want of unanimity among the states, which, under the existing confederation, was a perpetual bar to any restriction upon her commerce with the whole of the states; and any partial restriction would be sure to fail of effect.

St. George Tucker, *Blackstone's Commentaries* 1:App. 248–54 (1803). *See also* Letter from James Madison to James Monroe (August 7, 1785), *Papers 8:333–36 (reprinted in* 2 Philip B. Kurland & Ralph Lerner, *The Founders' Constitution,* at 487, 481 (1987)).

the Court is able to set forth their common sense meaning. As proposed by one commentator, "The term 'commerce' connotes some connection to the manufacture or sale of goods or to the provision of services for pay. The phrase 'among the several States' must be construed to require some non-negligible impact across state lines— from one state to another." Reddish at 42.

 Judicial review of Commerce Clause legislation is not exacting. A court reviewing legislation under the Commerce Clause "must defer to a congressional finding that a regulated activity affects interstate commerce 'if there is any rational basis for such a finding.'" *Preseault v. ICC*, 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) (quoting *Hodel v. Virginia Surface Min. & Reclam. Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)). As the Supreme Court wrote in *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964):

> Of course, the mere fact that Congress has said when particular activity shall be deemed to affect commerce does not preclude further examination by this Court. But where we find that the legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end.

*Id.*, 379 U.S. at 303–04, 85 S.Ct. at 383. In sum, judicial review is no longer necessary once a court determines that Congress had a rational basis for believing that a particular activity has a substantial effect on interstate commerce.

Although judicial review is forgiving, the standard is not so permissive as to be nonexistent. Together, the Commerce Clause and the Tenth Amendment clearly require a finding that a given activity have a substantial effect on commerce. Without some inquiry into the *substantiality* of ef-

fect, the limit on congressional authority becomes nugatory. In other words, if the Commerce Clause can mean everything, then it means nothing. Nearly every act, no matter how "local," can be imagined to have some effect, no matter how remote, on interstate commerce. To guard against this possibility, the courts have consistently held that an activity must have a *substantial effect* on interstate commerce to be regulated by Congress. As noted by Chief Justice Rehnquist in his concurrence to *Hodel:*

> Thus, it would be a mistake to conclude that Congress' power to regulate pursuant to the Commerce Clause is unlimited. Some activities may be so private or local in nature that they simply may not be in commerce. Nor is it sufficient that the person or activity reached have *some* nexus with interstate commerce. Our cases have consistently held that the regulated activity must have a *substantial* effect on interstate commerce. Moreover, simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so. Congress' findings must be supported by a "rational basis" and are reviewable by the courts.

*Hodel*, 452 U.S. at 310–11, 101 S.Ct. at 2391 (J. Rehnquist, concurring) (some emphasis added) (citations omitted).[72]

### 2. History of the judicial treatment of the Commerce Clause

The starting point in a precis of the evolution of the interpretation of the Commerce Clause is *Gibbons v. Ogden*, 22 (9 Wheat.) U.S. 1, 6 L.Ed. 23 (1824). The issue in that case was whether New York could grant an exclusive franchise that permitted steamships to travel between New York and New Jersey only with the franchisees' permission. Chief Justice Mar-

---

**72.** On this subject, one commentator has stated:
 Acceptance of the view that today all commerce is interstate effectively rejects the carefully structured constitutional scheme of limited federal power and supplants it with a structure in which the power of the federal government knows no limitations. There is

no rational means of construing the textual structure [of the Constitution] to allow such a result; such a change would therefore require resort to the formal amendment process, a recourse that would surely face significant political opposition.
Redish at 50.

shall decided, in pertinent part, that navigation among the several states was interstate commerce. He delineated internal commerce, which takes place wholly within one state, from external commerce, which crosses a state boundary. The Commerce Clause, he said, encompasses that portion of commerce which is within any one state so long as the trade begins in one state and ends in another:

> Commerce among the States, cannot stop at the external boundary line of each State, but may be introduced into the interior.
>
> It is not intended to say that these words comprehended that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient, and is certainly unnecessary.

*Id.* at 195.[73] Marshall focused on the nature of the transaction rather than on its location. If a commercial transaction crossed state lines, that transaction fell within the Commerce Clause. However, Marshall did not say that any activity that affects that interstate transaction was also within the purview of the Commerce Clause. *See* Richard A. Epstein, *The Proper Scope of the Commerce Power*, 73 Va. L.R. 1387, 1403 (1987) ("Epstein").

From *Gibbons* through the New Deal, the scope of the Commerce Clause was expanded somewhat. However, there remained a clear delineation between commerce on the one hand and manufacture and agriculture on the other. Epstein at 1410. The New Deal cases changed this by relying on a more expansive interpretation of the Commerce Clause.[74]

In *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), the Supreme Court held that the Wagner Act was validly enacted under the Commerce Clause. Section 10(a) of that Act provides: "The Board is empowered as hereinafter provided, to prevent any person from engaging in any unfair labor practice ... affecting commerce." 29 U.S.C.A. § 160(a). The Court decided that labor disputes may have an effect on interstate commerce by burdening or obstructing interstate or foreign commerce. *Jones & Laughlin*, 301 U.S. at 30–32, 57 S.Ct. at 621. The Court reasoned as follows: manufacturing has an effect on interstate commerce; labor disputes have an effect on manufacturing; thus, labor disputes have an effect on interstate commerce. *Id.*, 301 U.S. at 33–36, 40–42, 57 S.Ct. at 623, 626. Therefore, *Jones & Laughlin* established that an activity need only affect interstate commerce to be within the scope of the Commerce Clause.

In *United States v. Darby*, 312 U.S. 657, 61 S.Ct. 451, 85 L.Ed. 609 (1941), the Supreme Court held that an act that regulates only *intrastate* commerce may pass muster under the Commerce Clause. *Darby* involved a constitutional challenge to the Fair Labor Standards Act which prevented the shipment in interstate commerce of goods produced under labor conditions, *i.e.*, wages and hours, different from the standards set forth in the Act. The Act, said the Court, could constitutionally reach goods intended solely for intrastate distribution. The Court said:

**73.** Professor Epstein notes that Justice Marshall's use of "affects" was not intended to extend the clause to reach any regulation that touches commerce, however tangentially. Rather, it was intended to counter the narrow view of the Commerce Clause that Congress could not regulate that portion of an interstate journey that was within its own borders. Richard A. Epstein, *The Proper Scope of the Commerce Power*, 73 Va.L.R. 1387, 1405 (1987).

**74.** This point is not free from dispute. Professor Epstein claims that the New Deal "systematically removed each of the previous limitations on the scope of the commerce clause." Epstein at 1443. However, other commentators, such as Professor Tribe, have argued that the New Deal cases represented a return to the expansive interpretation of Chief Justice Marshall in *Gibbons*. Epstein at 1399 (citing Lawrence H. Tribe, *American Constitutional Law* § 5–7, at 240 (1978)). *See also Wickard v. Filburn*, 317 U.S. 111, 120, 63 S.Ct. 82, 87, 87 L.Ed. 122 (1942) ("At the beginning Chief Justice Marshall described the federal commerce power with a breadth never yet exceeded").

Congress having by the present Act adopted the policy of excluding from interstate commerce all goods produced for the commerce which do not conform to the specified labor standards, it may choose the means reasonably adapted to the attainment of the permitted end, even though they involve control of intrastate activities.

*Id.*, 312 U.S. at 121, 61 S.Ct. at 460. Therefore, *Darby* permitted Congress to regulate purely intrastate activity as long as such regulation was necessary to permit the goal of regulating interstate commerce. *Id.*, 312 U.S. at 120–23, 61 S.Ct. at 460–61.

Finally, in *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the Supreme Court held that Congress could regulate the consumption of wheat even though there was no sale transaction involved. Filburn, a farmer, challenged the constitutionality of an amendment to the Agricultural Adjustment Act of 1938 which set a marketing quota for his wheat farm. In particular, he objected to the application of congressional power to the production of wheat not intended for commerce. *Id.*, 317 U.S. at 118–20, 63 S.Ct. at 86. The Court upheld the Act. It said that home consumption of wheat in excess of the quota would have a substantial effect on interstate commerce:

> One of the primary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. *It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions.*

*Id.*, 317 U.S. at 128, 63 S.Ct. at 91 (emphasis added). *Wickard* thus established that an otherwise local act may be regulated by Congress under the Commerce Clause if the aggregate number of like acts would have a substantial effect on interstate commerce:

> That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial.

*Id.*, 317 U.S. at 127–28, 63 S.Ct. at 90. The *Wickard* Court found a substantial nexus between the farmer's home consumption of wheat—as an aggregate of the total number of farmers consuming wheat at home—and interstate commerce. After *Wickard*, any activity could be regulated by Congress as long as it had a substantial effect on interstate commerce.

The above cases trace, in broad strokes, the evolution of the Commerce Clause. To be within the ambit of the Commerce Clause, an activity originally had to be commerce that moved across state lines. With time, courts began to hold that the commerce need only affect movement across state lines. Finally, courts dropped the commerce requirement and applied the Clause to any activity that affects commerce that, in turn, affects movement across state lines. The sole remaining limitation on Congress's power under the Commerce Clause is the requirement that the effect on commerce be *substantial.*

### 3. Judicial treatment of the FHAA under the Commerce Clause

With this background, the Court turns to the instant issue: whether the Commerce Clause authorizes Congress to regulate alleged housing discrimination pursuant to the private sale of a home between two neighbors.

With one exception, discussed below, no court has expressly held that the Commerce Clause authorizes Congress to regulate housing discrimination.[75] In fact,

---

**75.** As noted by one commentator:

The thirteenth amendment might not be available, however, in Title VIII cases where the alleged discrimination is based on sex, religion, or some other nonracial ground. In these cases, the constitutional basis for the statute might have to be found elsewhere. A

likely candidate for at least some of these cases would be the fourteenth amendment, which has been held to prohibit sexual and other nonracial forms of governmental discrimination. In other situations, the power of Congress under the fourteenth amendment and the commerce clause to ban private hous-

those few cases that have addressed the issue have explicitly said that the Commerce Clause does *not* authorize Congress to regulate housing discrimination. In *United States v. Parma*, 661 F.2d 562 (6th Cir.), *cert. denied*, 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982), the Sixth Circuit stated unequivocally, but without explanation, that "[t]he Fair Housing Act was not enacted pursuant to the Commerce Clause. Rather it was based on authority of § 2 of the Thirteenth Amendment." *Id.* at 573. Two earlier district court decisions similarly found, without substantial elucidation, that the constitutionality of an FHA provision could not be sustained by the Commerce Clause. *Brown v. State Realty Company*, 304 F.Supp. 1236, 1239 (N.D.Ga. 1969) ("There is no evidence that the activities proscribed herein [FHA violations] are in interstate commerce and the court so finds. Thus, any claim of jurisdiction on such grounds must fail"); *United States v. Mintzes*, 304 F.Supp. 1305, 1312 (D.Md. 1969) ("This Court agrees that the constitutionality of § 3604(e), as sought to be applied in this case, cannot be sustained by the Commerce Clause").

The Court is aware of only one district court case which directly addressed the constitutionality of the FHAA under the Commerce Clause. In *Seniors Civil Liberties Ass'n v. Kemp*, 761 F.Supp. 1528 (M.D.Fla.1991), elderly residents of age-restricted housing brought suit claiming that the FHAA's ban on familial status discrimination was unconstitutional. The court upheld the Act under, among others, the Commerce Clause. Citing *Heart of Atlanta*

*Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), it emphasized the possible effect on interstate commerce if many families with children suffered housing discrimination:

> With the present mobility of the population in mind, it is certainly foreseeable that if an increasing amount of subdivisions, mobile homes, condominiums and apartments regularly excluded families with children, these same families would be prevented from seeking new housing around the country. The possibility of this discriminatory treatment would most likely prevent such families' interstate travel, and therefore affect interstate commerce.

*Id.* 761 F.Supp. at 1545.[76]

The *Kemp* decision has a number of aspects which render its analysis both generally dubious and specifically inapplicable to cases involving handicap discrimination such as the instant case. First, by basing its analysis on *Heart of Atlanta*, the *Kemp* court utilizes an inapplicable analytical framework. In *Heart of Atlanta*, the Supreme Court held that the Commerce Clause authorized Congress to regulate discrimination by a motel operator. The Court said that discrimination by motel operators was commerce with a substantial relation to the national interest. It first observed that the movement of people in interstate travel is commerce, even if that movement is not commercial in character. *Id.* 379 U.S. at 256, 85 S.Ct. at 357. It then referred to congressional findings that discrimination places a substantial burden on

---

ing discrimination would become important. *No decision has yet dealt with the constitutionality of Title VIII in a nonracial case.* Schwemm § 6 (emphasis added).

**76.** This analysis appears to rest on the following logical progression: (1) the present population is highly mobile; (2) it is possible that many areas would discriminate against families with children; (3) if so, these mobile families would be prevented from securing new housing; (4) the fear of this barrier might prevent these families from traveling across state lines; (5) the fact that these families eschew interstate travel will affect interstate commerce.

Inherent in this reasoning are several dubious assumptions. First, that a family would not

move across state lines solely for fear of encountering housing discrimination in the foreign state. Second, that housing discrimination in the foreign state is more egregious than housing discrimination in the home state. Third, that without federal intervention, housing discrimination would be unchecked. This last assumption ignores the fact that many states have their own fair housing laws which would contain discrimination even absent a federal statute. As of September 13, 1988, HUD recognized 40 states, including Michigan, as having fair housing laws at least substantially equivalent to the federal Fair Housing Act. Schwemm at App. C–1 (citing 53 *Fed.Reg.* 45019–20 (Nov. 7, 1988)).

interstate commerce in that it denies blacks the opportunity freely to travel from one state to another. Therefore, as discrimination by a motel operator affects the movement of people and has a real relation to the national interest, said the Court, Congress could proscribe it under the Commerce Clause. *Id.* 379 U.S. at 261–62, 85 S.Ct. at 360.[77]

The two cases are distinguishable. Motels are, by definition, integrally connected with travel, often with interstate travel. Indeed, the sole purpose of a motel is to facilitate travel. Arguably, widespread discrimination by motel operators could affect the interstate movement of travelers. In direct contrast, housing is connected with immobility and a degree of permanence. In fact, there are few areas of life that could be considered to have less of an interstate component than housing. Clearly, the quantity of interstate travel connected to permanent relocation is infinitesimal compared to that associated with motel use.

Moreover, the *function* of motels is to facilitate travel. Thus, there is a necessary link between motels and interstate travel. Housing, on the other hand, can function, and often does function, without any link to interstate travel. In the context of a Commerce Clause constitutional analysis, motels and permanent housing simply cannot be equated. *Kemp* fails to provide a *rational* basis for Congress's determination that housing discrimination substantially affects interstate commerce. As such, this Court must reject the general constitutional underpinnings of *Kemp*.

In its *amicus curiae* brief, the Government refers the Court to *Russell v. United States,* 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985) and, *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), in support of its position that Congress has the authority to prohibit housing discrimination against the handicapped.

*Russell* addressed the issue of whether 18 U.S.C. § 844(i) applied to a rental apartment building which had been treated as business property for tax purposes. That statute provides:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property *used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce* shall be imprisoned for not more than ten years or fined not more than $10,000, or both....

18 U.S.C. § 844(i) (emphasis added). In finding that this statute applied to the owner of an apartment building who attempted to set fire to his building, the Court emphasized that the statute was limited to business property as opposed to private property: "In sum, the legislative history suggests that Congress at least intended to protect all business property, as well as some additional property that might not fit that description, but perhaps not every private home." *Id.* 471 U.S. at 861, 105 S.Ct. at 2457. The Court then found that the particular building in question had been used in an activity affecting interstate commerce—namely, the interstate rental of business property: "We need not rely on the connection between the market for residential units and 'the interstate movement of people,' to recognize that the local rental of an apartment unit is merely an element of a much broader *commercial market in rental properties." Id.* (emphasis added). As the subject building was part of an interstate commercial market in business property, it satisfied the requirements of § 844(i). The Court concluded by noting that "[t]he property was therefore being used in an activity affecting commerce *within the meaning of § 844(i)." Id.* (emphasis added).

The reasoning in *Russell* does not reach the instant case. *Russell* addressed the limited question of whether a particular

---

**77.** *See also Katzenbach v. McClung,* 379 U.S. 294, 298, 85 S.Ct. 377, 381–81, 13 L.Ed.2d 290 (1964) (holding that discrimination in restaurant substantially affects interstate commerce because it discourages interstate travel and because such a restaurant invariably sells fewer interstate goods).

commercial property had been part of the commercial market in rental properties. As that building was found to have been a business property, and thus part of the interstate real estate market, it fell within the language of the statute. *Russell* does not control the Commerce Clause analysis of a different property sold under different conditions. In the instant case, the subject property was a private dwelling and the sale was between two private individuals operating without any connection to any commercial entity. Nothing in *Russell* compels this Court to find the instant transaction to be within the ambit of the Commerce Clause.

In *McLain,* the Supreme Court examined whether the Sherman Act extends to an agreement among real estate brokers in a market area to conform to a fixed rate of brokerage commissions on sales of residential property. It first noted that the reach of the Sherman Act is commensurate with that of the Commerce Clause. *Id.,* 444 U.S. at 239–40, 100 S.Ct. at 508. It then said that to establish federal jurisdiction under the Sherman Act, the plaintiffs had to demonstrate that the defendants' brokerage activity had a substantial effect on interstate commerce. *Id.,* 444 U.S. at 241–42, 100 S.Ct. at 509. The Court noted that the alleged conspiracy involved an appreciable amount of financing, some from out of state. Additionally, by affecting the terms and frequency of local real-estate transactions, the brokers, said the Court, could reasonably be seen as having had a not insubstantial effect on interstate commerce. *Id.,* 444 U.S. at 245, 100 S.Ct. at 511. It concluded that the plaintiffs should be given the opportunity to argue for jurisdiction under the Sherman Act:

> Where, as here, the services of respondent real estate brokers are often employed in transactions in the relevant market, petitioners at trial may be able to show that respondents' activities have a not insubstantial effect on interstate commerce.

*Id.,* 444 U.S. at 245, 100 S.Ct. at 511.

Again, the holding in *McLain* is not dispositive. The brokerage activities in *McLain* had a much greater and a much more direct effect on interstate commerce, both quantitatively and qualitatively, than the activity at issue in this case. The scope of subject activity in the instant case is far more narrow. It concerns a single, isolated housing transaction between two neighbors operating without a broker or any other intermediary. Unlike the price-fixing scheme in *McLain,* this activity had little, if any, interstate effect. For this reason, the Court finds that the holding in *McLain* does not control the instant case.

4. Legislative treatment of the FHAA under the Commerce Clause

Apparently, the Commerce Clause was cited only one time during the deliberations on the FHAA in a colloquy between Senator Symms and Senator Specter:

> Mr. Symms. The question that I have, Mr. President, is when we talk about who is enlightened and who is not enlightened, when I look at the building codes in the United States as opposed to the nonmarket countries, we have it way the best, yet we are trying to impose the long nose of the Federal Government into the size of bathrooms. And my question would be to one of the learned Senators on the floor: What clause in the Constitution gives the Federal Government the right to go in and set the size of bathrooms and building codes? Is this in the 13th amendment or is it from the commerce clause in the Constitution? Where does this come from? Is this even constitutional? That is my question.

> \* \* \* \* \* \*

> Mr. Specter. Mr. President, I would be delighted to respond to the question. The commerce clause.

> Mr. Symms. The Senator says the commerce clause. Does the size of bathrooms in multiunit housing affect the commerce clause?

> Mr. Specter. Yes.

> Mr. Symms. How?

> Mr. Specter. Because the Commerce Clause touches the construction of housing where the materials passed in interstate commerce. Where there is a deter-

mination by the Congress of the United States that interstate commerce is affected, the decisions by the Supreme Court of the United States are clear that it may reach issues like housing comprehended by this Fair Housing Act.

134 Cong.Rec. 19879–80 (August 2, 1988). With the exception of this colloquy, Congress did not appear to have addressed the constitutional basis for the enactment of legislation banning housing discrimination under the FHAA.

To find a fuller discussion of the constitutionality of the FHAA, the Court must look to the legislative history surrounding the enactment of the FHA. The FHA's legislative history is relevant only to the extent that the class of activities regulated by the FHA is the same as, or similar to, the class of activities regulated by the FHAA. In such case, the rational basis applied to the FHA would apply to the FHAA as well.[78]

Congress relied primarily on three bases in finding that it had the authority under the Commerce Clause to enact the FHA. First, that the home finance industry, *e.g.*, those institutions that provide home mortgages, had a significant effect on interstate commerce. Second, that a significant quantity of building materials and home furnishings passed through interstate commerce in connection with the construction, sale, lease, and furnishing of dwellings. Third, that housing discrimination had a substantial effect on the interstate movement of people. *See* "Memorandum of Law on the Constitutionality of Federal Fair Housing Legislation," 1967 Senate Hearings.[79]

The implicit premise underlying all three bases is as follows: Housing discrimination prevents members of protected classes from relocating; because they do not relocate as much as they would without this discrimination, there are, in the aggregate, fewer overall housing transactions across the country; the lessened number of transactions substantially reduces the interstate movement of money, labor, and building materials that otherwise would be involved. *See, e.g., Id.* at 257 ("When discrimination in housing imposes on our cities and suburbs a pattern of racial ghettoization, this pattern necessarily affects adversely the interstate movement of mortgage funds"). Additionally, and for the same reasons noted above, when the desired relocation is out of state, discrimination substantially affects the interstate movement of people.

A review of the legislative history further reveals that there was some confusion and disagreement surrounding the application of the Commerce Clause to certain portions of the FHA. Representative Anderson said:

I can understand how you apply the Commerce Clause to subdividers and developers. But restricting my question to the individual homeowner, what is the precise basis there? The fellow who just has one house to sell, not the developer, builder or realtor, but the fellow with one house to sell who doesn't sell more than one?

*To Prescribe Penalties for Certain Acts of Violence and Intimidation: Hearings on H.Res. 1100 Before the House of Representatives committee on Rules, Pt. I,* 90th Cong., 2d Sess., at 46. Representative

---

**78.** In this regard, the Court observes that the legislative history of the FHA seems to have been devoted almost exclusively to the housing problems experienced by blacks.

**79.** During hearings in the House Rules Committee and floor debate, Representative Celler said:
 In the building of that one house, as in the building of dozens of houses or in the building of a development, the lumber comes from out of State, very likely; the steel comes from out of State; the furnishings come probably from out of State. Labor may come from out of the State. The architect may live in a different State. The builder may live in a

different State, so that commerce is affected. So that I would say that there is no doubt that commerce having been affected in this way, commerce clause having been touched, I think we have an eminent right to legislate. *To Prescribe Penalties for Certain Acts of Violence and Intimidation: Hearings on H.Res. 1100 Before the House of Representatives committee on Rules, Pt. I,* 90th Cong., 2d Sess., at 45–47 (statement of Rep. Emanuel Celler, Chairman, House Committee on the Judiciary). *See also* Senate Hearings at 354–55 (Sen. Mondale); Senate Hearings at 7 (Attorney General Clark).

Wiggins said: "For this legislation to be constitutional, it will have to reach only commerce, and the legislation is not drafted in that way. Its reach is beyond commerce or even things that affect commerce." House Hearings II at 81.

### 5. Analysis

■■■ Congress may have the power under the Commerce Clause, as currently interpreted, to proscribe some forms of housing discrimination. However, the reach of this authority does not extend to each and every housing transaction alleged by any plaintiff to be discriminatory. Simply because Congress may regulate a general type of activity that has a substantial interstate effect does not mean that Congress may likewise regulate the same type of activity when it has absolutely no interstate effect whatsoever. As noted by the Chief Justice, "Some activities may be so private or local in nature that they simply may not be in commerce." *Hodel*, 452 U.S. at 309, 101 S.Ct. at 2391 (J. Rehnquist, concurring). When a particular activity cannot be shown to have a substantial effect on interstate commerce, that activity may not be proscribed by Congress under the Commerce Clause.

The Court begins with the observation that if the word "affects" is given a sufficiently broad interpretation, virtually any activity imaginable "affects" interstate commerce. If the constitutional criterion were only whether a given activity has any effect on interstate commerce, Congress would be able to assert control over any activity or conduct it chose to legislate, and the Commerce Clause would be rendered nugatory. This Rorschach test [80] approach to Commerce Clause analysis, in which one sees in the Commerce Clause authority for the federal government to reach every conceivable human activity, would not only emasculate the doctrine of federalism, one of the most significant principles on which this country was founded, but would also completely reverse the structure of government set forth in the Constitution in which only those powers specifically reserved to Congress under Article I, Section 8 do not belong to the states or the people. This is, no doubt, why courts have insisted that the effect on interstate commerce be *substantial*. Without such insistence, a crucial pillar on which our constitutional system of federal government stands would be interpreted away into irrelevance.

■■ The Court interprets the phrase "substantial effect" as having two interrelated parts. First, the regulated activity, alone or in the aggregate, must result in a significant *quantity* of interstate transactions. Purely isolated examples of interstate movement are insufficient to bring an activity within the scope of the Commerce Clause. Second, the regulated activity, alone or in the aggregate, must have a *direct causal nexus* to interstate commerce. It is not sufficient that the regulated activity affect another activity which, in turn, has a substantial interstate commerce effect. Rather, the interstate effect must be brought about directly by the regulated activity.

Even in *Wickard*, which greatly expanded the scope of the Commerce Clause, the Court limited the reach of the Commerce Clause to those activities which would have a substantial effect on interstate commerce: "Hence the reach of that [Commerce Clause] power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power." *Wickard*, 317 U.S. at 124, 63 S.Ct. at 89 (quoting *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 118–19, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942)). In that case, the Court explicitly found that local wheat consumption would have a substantial economic effect on the interstate market for wheat by influencing the price of that wheat. *Id.*, 317 U.S. at 127–28, 63 S.Ct. at 90–91.

In this case, by contrast, the Court does not believe that the proscription of a private sale of a home will have a substantial effect on interstate commerce. Certainly

---

**80.** Swiss psychiatrist Hermann Rorschach designed a personality analysis procedure in which a person looks at ink-blot shapes and describes what he sees in the shape. In other words, the shapes represent whatever each person believes they represent.

Congress has failed to provide a rational basis for so concluding. While there may be a connection between the withholding of wheat and the market price of wheat, there is no similar connection between housing discrimination against the handicapped and the interstate housing market when the sale of the housing is between purely private parties (in this case, neighbors) acting without brokers and outside the established professional real estate market. Even in the aggregate, the Court cannot rationally conceive of (nor have Plaintiffs proffered) a situation in which the purely private instances of housing sales which allegedly deny housing to the handicapped would have a substantial effect on the movement of people, home finance, and building materials in interstate commerce.

The substantial effect criterion was employed by the Seventh Circuit when it held that the Clean Air Act could not constitutionally be applied under the Commerce Clause to a particular piece of property. That case, *Hoffman Homes, Inc. v. Administrator, United States Environmental Protection Agency*, 961 F.2d 1310 (7th Cir.1992), concerned the effort of the Environmental Protection Agency ("EPA") to regulate an intrastate wetland known as Area A. After deciding that the Clean Water Act does not regulate isolated wetlands, the court addressed the reach of the Commerce Clause.[81] It said that prior pollution cases held valid under the Commerce Clause involved pollution that had an effect on interstate commerce. *Id.* at 1319.

However, in *Hoffman Homes*, the EPA failed to construct any "theory of how filling Area A affects interstate commerce. And, no evidence on the record would support any such theory." *Id.* at 1319, 1321.[82] On this basis, the court found that Congress had no rational basis for finding that filling Area A affected interstate commerce and thus decided that the regulation in question was beyond the limits of the Commerce Clause. *Id.*

In *Crane v. Intermountain Health Care, Inc.*, 637 F.2d 715 (10th Cir.1980), a pathologist filed a Sherman Act claim asserting that the administrator and owner of a hospital conspired to preclude him from practicing at that hospital.[83] The Tenth Circuit found that the plaintiff had failed to alleged a substantial effect on interstate commerce and thus could not sustain a Sherman Act claim.[84] The plaintiff had alleged that the hospital purchased a significant portion of medical supplies from out of state and that it received insurance revenues from out of state insurance companies. He added that he had performed services for out of state patients. The court decided, however, that the plaintiff had failed to demonstrate how the alleged conspiracy affected the rendition of medical services, purchase of supplies, or receipt of revenue:

He does not say how this local activity affects interstate commerce. The complaint fails to disclose anything but an incidental relationship to trade and commerce among the states. *General alle-*

**81.** The Court said:

Even if Congress did intend to regulate all "navigable waters," including all wetlands, within its constitutional reach under the Commerce Clause, however, the EPA's claim of authority to regulate Area A is unreasonable if Area A is beyond that constitutional reach. The issue thus becomes: Is Area A within constitutional reach under the Commerce Clause?

*Hoffman Homes, Inc. v. Administrator, United States Environmental Protection Agency*, 961 F.2d 1310, 1317 (7th Cir.1992).

**82.** The Court said:

For example, there is no evidence that filling Area A would affect navigation. There is no evidence that filling Area A would pollute another open body of water used for irrigation, fishing or recreational activities. There is no evidence that interstate travelers visited Area A (and it is hard to imagine a purpose for their doing so).

*Hoffman Homes, Inc. v. Administrator, U.S. E.P.A.*, 961 F.2d 1310, 1319–20 (7th Cir.1992).

**83.** As noted, the scope of the Sherman Act is commensurate with the scope of the Commerce Clause. *McLain*, 444 U.S. at 239–40, 100 S.Ct. at 508.

**84.** On rehearing, the court decided to permit the plaintiff to attempt to adduce additional evidence to prove that the alleged conspiracy would substantially affect interstate commerce. *Crane v. Intermountain Health Care, Inc.*, 637 F.2d 715, 725 (10th Cir.1980).

*gations of involvement in interstate commerce do not suffice to supply the nexus between restraint and substantial effect on interstate commerce.*

*Id.* at 718 (emphasis added). Other Sherman Act cases, including those from the Sixth Circuit, have found that an alleged interstate effect is insufficient to establish jurisdiction. *See Sarin v. Samaritan Health Center,* 813 F.2d 755 (6th Cir.1987) (denial of staff privileges at local hospital could not have more than *de minimus* effect on interstate commerce); *Stone v. William Beaumont Hospital,* 782 F.2d 609 (6th Cir.1986) (same); *Bain v. Henderson,* 621 F.2d 959, 961 (9th Cir.1980) (selection of attorneys for the court appointed list did not have a substantial effect on interstate commerce); *Thornhill Pub. v. General Telephone & Electronics,* 594 F.2d 730, 739 (9th Cir.1979) (plaintiff's telephone directory business did not substantially affect interstate commerce). These cases indicate that the reach of the Commerce Clause is not limitless and that a court applying it must ensure that the challenged activity does indeed have a substantial interstate effect.

As in *Hoffman Homes* and *Crane,* the instant Plaintiffs have failed to convince the Court that the type of housing discrimination alleged in this case has a substantial effect on interstate commerce. Plaintiffs (and the United States) argue that housing discrimination against the handicapped will affect the interstate movement of building materials and funds for home financing. They add that it will affect the interstate movement of people.

The Court is able to envision limited instances in which housing discrimination against the handicapped could have a substantial interstate effect. For example, if a cartel of national developers were to adopt a policy of systematically refusing to transact business with the handicapped, this could have a substantial effect on interstate commerce.

However, the Court believes that it defies logic to suggest that discrimination against the handicapped in a private transaction between neighbors has such an ef-

fect. In this case, there was no broker, no interstate travel, and no interstate services involved. The Court is thus unable to conclude that Congress had a rational basis to believe that such transactions are within the ambit of the Commerce Clause. Rather, these instances of discrimination are better handled under state law.

The goal of the FHAA is unquestionably laudable and the Court would prefer to ignore or circumvent the constitutional impediments. However, to do so would be to turn a blind eye to the constitutionally established and mandated division of governmental responsibility. The Court is unable to say that Congress had a rational basis for finding that the FHAA applies to the facts of this case. Therefore, the Court holds that the instant case of alleged housing discrimination is beyond the reach of the Commerce Clause and thus that the FHAA cannot, within constitutional limitations, be applied to reach this case.

Having addressed the issues submitted to the Court under the FHAA, the Court will now examine the remaining federal issues.

## VI. CIVIL RIGHTS ACT OF 1871

■ All Defendants are charged with violating either § 1985(3) alone or both § 1985(3) and § 1986. Section 1985(3) reads, in relevant part, as follows:

> If two or more persons ... conspire ... for the purpose of depriving ... any person ... of the equal protection of the laws, or of equal privileges and immunities under the laws, ... if one or more persons engaged therein do ... any act ... whereby another is injured ... or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

■ Section 1985(3) is a remedial statute the aim of which is to provide an effective remedy for private conspiracies that violate other existing rights. *Volunteer*

*Medical Clinic, Inc. v. Operation Rescue,* 948 F.2d 218 (6th Cir.1991). As noted by the Supreme Court in *Great American Federal Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979): "Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Id.,* 442 U.S. at 372, 99 S.Ct. at 2349. *See also Griggs v. National Railroad Passenger Corporation Corp.,* 900 F.2d 74, 76 (6th Cir.1990).

■■■ As this Court has decided that Defendants have violated no independent rights accorded to Plaintiffs, it refuses to hold that Defendants have conspired against Plaintiffs. Further, as the Court has determined that Defendants have not violated § 1985(3), it necessarily holds that Defendants have not violated § 1986 which is only violated when a person fails to prevent a violation of § 1985.[85]

## VII. STATE LAW CLAIMS

■■■ Plaintiffs assert claims against each Defendant under the Michigan Handicappers' Civil Rights Act. However, as the Court has dismissed all Plaintiffs' federal claims, it must first decide whether to retain the pendent state claims before addressing them on the merits. In addressing this issue, the Sixth Circuit set forth the standard as follows:

> Under *United Mine Workers of America v. Gibbs,* [383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218] a district court has the power to exercise jurisdiction over pendent state-law claims if the following prerequisites are met: (1) the federal claim must have substance sufficient to confer subject matter jurisdiction on the court, (2) the state and federal claims must derive from a common nucleus of operative fact, and (3) the claims must be such that plaintiff would ordinarily be expected to try them in one judicial proceeding.

*Aschinger v. Columbus Showcase Co.,* 934 F.2d 1402, 1412 (6th Cir.1991) (citation omitted).

The Sixth Circuit has stated that even if it has the power to hear the pendent claims, a federal court should exercise that power only in extremely limited circumstances:

> [I]t is apparent that trial courts do possess some discretion to decide a pendent state law claim once the federal basis for jurisdiction is dismissed. A trial court must balance the interests in avoiding needless state law decisions discussed in *United Mine Workers* against the "commonsense" policies of judicial economy discussed in *Rosado* [*v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442] when deciding whether to resolve a pendent state claim on the merits.
>
> *Through a series of cases following United Mine Workers, this circuit has adopted the position that the district courts have minimal discretion to decide pendent state law claims on the merits once the basis for federal jurisdiction is dismissed before trial.* However, in certain cases, the overwhelming interests in judicial economy may still allow a district court to properly exercise its discretion and decide a pendent state law claim once the federal claim is dismissed before trial.

*Province v. Cleveland Press Pub. Co.,* 787 F.2d 1047, 1055 (6th Cir.1986) (emphasis added).

In this case, the Court believes that there is no overwhelming interest in judicial economy which compels the Court to decide the state law issues. The state statute, while similar to the FHAA, is not wholly analogous. Had the Court not dismissed the federal claims, this similarity would counsel for a consolidation of the state and federal claims. However, having dismissed

---

**85.** Section 1986 reads, in relevant part:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented.

42 U.S.C. § 1986.

**744**

the federal claims, the Court believes that interpretation of this statute is better left to the state court.

### CONCLUSION

The Court holds that there is no genuine issue of material fact in this case. It will deny Plaintiffs' Motion for Summary Judgment and grant Defendants' motions for summary judgment. It will also dismiss the Complaint with prejudice.

NOW, THEREFORE;

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment be DENIED and Defendants' motions for summary judgment be GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' federal claims be DISMISSED WITH PREJUDICE and Plaintiffs' state claims be DISMISSED WITHOUT PREJUDICE. Plaintiffs may refile their state law claims in state court.